# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 06-0822 (JR) |
| DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, | ) ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56, Federal Rules of Civil Procedure, defendant, the Director of the United States Patent and Trademark Office ("USPTO" or "defendant") respectfully moves that summary judgment be entered in favor of defendant.   Plaintiff Innovatit Seafood Systems, LLC ("Innovatit" or "plaintiff") brought the present action under 35 U.S.C. § 145 challenging the decision of the Board of Patent Appeals and Interferences ("Board"), which affirmed the rejection of claims 3, 4, 6, 7, and 27 of Innovatit's U.S. Patent Application Serial No. 09/121,725 ("the '725 application") as unpatentable under 35 U.S.C. §§ 102 and 103.   As set forth in the Memorandum of Points and Authorities in support of this motion, there are no genuine issues of material fact as to the unpatentability of claims 3, 4, 6, 7, and 27 of the '725 application under 35 U.S.C. §§ 102 and 103.   Further, the Board's decision is supported by substantial evidence, and defendant is entitled  to judgment as a matter of law.   Accordingly, defendant respectfully requests that this Court grant its motion for summary judgment.   A statement of material facts not in dispute and a proposed order are submitted herewith.

Respectfully submitted,


_____/S/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/S/_____
RUDOLPH  CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 514-7198
(202) 514-8780 (facsimile)

Of Counsel:

STEPHEN WALSH
Acting Solicitor

BENJAMIN D. M. WOOD
JANET GONGOLA
Associate Solicitors
United States Patent and Trademark Office

November 2, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-0822 (JR) |
| | ) | |
| DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 7(h), Defendant submits this statement of facts as to which there is no genuine issue.

1.      Ernest A. Voisin filed U.S. Patent application No. 09/121,725 ("the '725 application"), entitled "A Process of Elimination of Bacteria in Shellfish, of Shucking Shellfish and an Apparatus Therefor," on July 24, 1998.  R1356-91.

2.      The specification of the '725 application discloses a process for eliminating harmful bacteria in shellfish, such as oysters, by exposing the shellfish to high pressure for a limited period of time, without applying heat.  R1388.

3.      The specification notes that bacteria from the *Vibrio* genus, such as *Vibrio vulnificus*, which are found in warm coastal waters around the U.S., are of particular concern. R1365.  Eating raw oysters infected by the *Vibrio vulnificus* bacteria may cause food poisoning that, in rare cases, is fatal.  R1366.

4.      According to the specification, the claimed high pressure process kills the bacteria

on the surface of or harbored within the shellfish, without destroying the "sensory qualities" of raw shellfish.  R1372.

     5.     Claims 3, 4, 6, 7, and 27 are at issue in this case.  Claims 3, 6, and 27 are independent claims.  R1594-95.  Claim 4 depends from claim 3, and claim 7 depends from claim 6.  R1594.

     6.     Claim 27 reads:

> A process of treating raw molluscan shellfish, comprising the steps of:
>
> depositing the raw molluscan shellfish into a pressure vessel and pressurizing the pressure vessel to between 20,000 p.s.i. and 80,000 p.s.i. for 1 - 15 minutes without application of heat at ambient temperature, without causing thermal and mechanical damage to the raw molluscan shellfish, while eliminating pathogenic naturally-occurring marine bacteria in said raw molluscan shellfish, and while retaining sensory characteristics of said raw molluscan shellfish.

R1595.

     7.     Independent claim 3 is similar to claim 27, and adds the process step of retaining the processed shellfish at a temperature below ambient temperature – *e.g.*, refrigeration:

> Process [sic] of destroying bacteria in raw molluscan shellfish, while shellfish is in the shell, comprising the steps of:
>
> providing a pressure vessel;
>
> depositing said shellfish into said pressure vessel;
>
> loading a pressure transmitting fluid into said pressure vessel;
>
> pressurizing said pressure vessel to high pressure of between about 20,000 p.s.i. and 80,000 p.s.i., without application of heat, for a period of time of between 1 and 15 minutes, thereby causing elimination of naturally-occurring pathogenic marine bacteria, while retaining sensory characteristics of said shellfish, and then

> retaining said shellfish at a temperature below ambient
> temperature.

R1594.

       8.     Claim 4 depends from claim 3, and is further limited to a pressurization process

sufficient to eliminate *Vibrio* bacteria:

> The process of Claim 3, wherein said raw shellfish is exposed to
> isostatic pressure for a time period sufficient to eliminate
> pathogenic Vibriones bacteria.

R1594.

       9.     The term "Vibriones" refers to members of the *Vibrio* genus of bacteria.  R1003.

      10.    Independent claim 6 is similar to claim 27, but is specifically directed to the

treatment of oysters and to the elimination of "Vibriones" (*i.e.*, *Vibrio*) bacteria:

> A process of treating raw oysters in a shell, which comprises:
>
> exposing raw oysters to hydrostatic pressure of between 20,000
> p.s.i. and 80,000 p.s.i. for 1-15 minutes at ambient temperature,
> without causing thermal and mechanical damage to the raw
> oysters, thereby eliminating pathogenic Vibriones bacteria in said
> raw oysters, preventing deterioration of said raw oysters, while
> retaining sensory characteristics of said raw oysters.

R1594.

      11.    Claim 7 depends from Claim 6, and adds the process step of "banding" the oysters

and enclosing them in liquid-impermeable bags prior to pressurization:

> The process of Claim 6, wherein said oysters are banded and
> enclosed in liquid-impermeable bags filled with pressurizable
> liquid prior to exposing said oysters to hydrostatic pressure so as to
> prevent bleeding of raw oysters during treatment.

R1594.

      12.    Japanese Patent Application 4356156A to Yasushi et al. ("JP '156") was

published on December 9, 1992.  R1145-50.

13.     JP '156 teaches a method of shucking raw shellfish, such as oysters, by exposing

them to pressures of between about 1000 and 4000 "normal atmospheres" (14,200 to 56,800

p.s.i.) for about 0.5 minutes to 10 minutes.  R1146-47.

14.     A "normal atmosphere" is equivalent to 1 Kg/cm$^2$, which is equivalent to 14.22

p.s.i.  R1147; CRC HANDBOOK OF CHEMISTRY AND PHYSICS F-319 (63rd ed. 1982).

15.     JP '156 teaches that pressures of about 1000 normal atmospheres (14,220 p.s.i.) to

about 4000 normal atmospheres (56,880 p.s.i) are used in carrying out the disclosed process.

R1147.

16.     JP '156 teaches that when pressurizing shellfish to 2000 normal atmospheres, or

28,440 p.s.i, the pressure should be maintained for about 3 to 10 minutes.  R1147.

17.     JP '156 teaches that when pressurizing shellfish to 3000 normal atmospheres, or

42,660 p.s.i., the pressure should be maintained for about 0.5 to 5 minutes.  R1147.

18.     JP '156 teaches that when pressurizing shellfish to 4000 normal atmospheres, or

about 56,880 p.s.i, the pressure should be maintained for about 0.5 to 3 minutes.  R1147.

19.     JP '156 discloses a specific embodiment, "Embodiment 1," in which (i) oysters in

the shell are placed in a plastic bag with sea water; (ii) the bag is sealed and placed in a high

pressure processing device; and (iii) a pressure of 3000 normal atmospheres, or approximately

42,660 p.s.i., is applied to the oysters for three minutes.  R1149.  The oysters are rendered easy

to open with fingers but still raw.  R1150.

20.     Oysters treated in accordance with the process disclosed in Embodiment 1 of JP

'156 remain raw, *i.e.*, retain sensory characteristics of raw shellfish.  R1150.

21.     Pressurizing oysters to 42,660 p.s.i. for 3 minutes will eliminate naturally-occurring pathogenic marine bacteria, such as *Vibrio* bacteria, in the oysters.

22.     The elimination of *Vibrio* and other naturally occurring marine bacteria in oysters is an inherent result of the pressurization process disclosed in Embodiment 1 of JP '156.

23.     U.S. Patent No. 5,773,064 to Tesvich et al. ("the Tesvich '064 patent" or "Tesvich") issued on June 30, 1998, from an application filed on March 22, 1996.  Statement of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def. Statement"), Exh. A, cover page.[1]

24.     Tesvich discloses a method of destroying *Vibrio vulnificus* bacteria on shell-stock molluscan shellfish, while leaving the shellfish meat in a raw state.  Def. Statement, Exh. A. This method uses "mild heat treatment" followed by rapid cool-down and cold storage.  *Id.*, col. 2, lines 31-36; col. 5, line 57 - col. 6, line 7.  The mollusks have a band placed around the shells to keep them closed during treatment.  *Id.*, col. 5, lines 14-18, 42-47.  The treatment duration and temperatures are selected so as to not cook the shellfish.  *Id.*, col. 5, lines 50-52.  When consumed, the mollusks retain their "natural flavor and raw texture."  *Id.*, col. 6, lines 15-18.

25.     Tesvich teaches that shellfish are to be placed in cold storage – refrigeration – following treatment and prior to consumption.  Exh. A, col. 2, lines 54-56; col. 6, lines 8-14; Fig. 2.

26.     Tesvich teaches that flexible bands are placed around the shells of shellfish prior to treatment to keep the shells closed during treatment.  Exh. A, col. 2, lines 40-43; col. 5, lines

---

[1]  The Tesvich '064 patent is also found in the administrative record filed in *Innovatit Seafood Systems, LLC v. Dudas*, No. 06-825, at R56A - H.

14-36.

27.     At the time of the invention a person with ordinary skill in the art would have been motivated to refrigerate raw shellfish, as taught in Tesvich, following the pressurization treatment of JP '156, since shellfish remained raw after such treatment and refrigeration was a well-known means of preserving raw seafood.

28.     On October 6, 2003, Innovatit submitted four declarations from persons allegedly skilled in the art of processing shellfish.  These declarations, submitted by LeRoy Chauvin, Michael Voisin, Alfred Sunseri, and Christopher Nelson, (hereinafter, "the CVSN Declarations"), are identical except for introductory paragraphs that set forth the experience of the declarants.  R1412-21.

29.     The examiner found that Innovatit's CVSN Declarations were insufficient to overcome the § 102 rejection of claims 6 and 27 and the § 103 rejection of claims 3, 4, and 7. R1424-27.  The examiner issued a final rejection of claims 3, 4, 6, 7, and 27 on October 30, 2003.  R1423.

30.     Innovatit appealed the examiner's final rejection to the Board.  R1466.  In support of its appeal, Innovatit submitted the declaration of the inventor, Ernest Voisin ("the Inventor Declaration," R1596-97), and Japanese Patent 2000157157A to Shitsuetsu *et al.* ("Shitsuetsu," R1601-27).

31.     In his declaration Inventor Voisin stated, *inter alia*, that he pressurized oysters to 3000 atmospheres for "0.5 to 5 minutes" in accordance with the teachings of JP '156.  R1597. He conducted this test at 50 °F, which he characterized as "ambient" temperature.  As a result of this pressurization, 80% of the tested oysters were shucked.  *Id.*  Inventor Voisin concluded from

this and similar test results that the method of JP '156 was "commercially uncertain." *Id.*

32.    Shitsuetsu discloses a method of opening raw oysters and other bivalves through the application of heat and pressure in a way that does not cook the shellfish meat.  R1601.  According to the reference, the use of pressure combined with heat permits the use of lower pressure as compared to the use of pressure alone (*i.e.*, without the application of heat, as disclosed in JP '156).  R1605-06.

33.    The Board affirmed the examiner's rejections under 35 U.S.C. §§ 102(b) and 103(a).  R1664-75.

34.    The Inventor Declaration demonstrates that the process disclosed in JP '156 is successful in shucking oysters, in that it indicated that 80% of oysters tested were shucked at the pressure and duration conditions exemplified in Embodiment 1 of JP '156.  *Id.*

35.    Innovatit failed to provide any evidence – other than the conclusory CVSN Declarations – to rebut the examiner's *prima facie* case that the process of JP '156 inherently results in the elimination of pathogenic bacteria.  R1671-72.

36.     In its Appeal Briefs to the Board, Innovatit did not dispute the examiner's findings regarding the teachings of the Tesvich '064 patent.  R1581-93.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH  CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 514-7198
(202) 514-8780 (facsimile)

Of Counsel:

STEPHEN WALSH
Acting Solicitor

BENJAMIN D. M. WOOD
JANET GONGOLA
Associate Solicitors
United States Patent and Trademark Office

Dated: November 2, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-0822 (JR) |
| | ) | |
| DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION AND SUMMARY**

Defendant, the Director of the U.S. Patent and Trademark Office ("USPTO"), respectfully submits this statement of points and authorities in support of its motion for summary judgment.   Plaintiff Innovatit Seafood Systems, LLC ("Innovatit") challenges a decision of the Board of Patent Appeals and Interferences ("Board"), in which the Board found that four of the claims in Innovatit's U.S. Patent Application No. 09/121,725 are unpatentable.  The Board's decision is supported by substantial evidence, and summary judgment should therefore be entered for defendant.

The Board's conclusion that the processes at issue in these four claims were unpatentable was consistent with applicable law and supported by record evidence.  To be patentable, a claim must be novel (i.e., not anticipated under prior art), and "nonobvious" to a person of ordinary skill in the art at the time the claim is made.  Innovatit seeks to patent a process for disinfecting

raw shellfish, such as oysters, by exposing the shellfish to high pressure, without the application

of heat, for a specified period of time.  This process is not new, however.  The prior art teaches

using the same high-pressure process to "shuck" raw oysters and other shellfish.  While the prior

art does not teach using high pressure to specifically disinfect raw shellfish, disinfection

inherently occurs when the prior art shucking process is performed.  Under controlling case law,

Innovatit's discovery of this beneficial but inherent result of an old process does not entitle it to a

patent on that process.

Innovatit also seeks to obtain a patent on processes that employ, in addition to high

pressure, well-known techniques for processing raw shellfish, such as refrigeration and placing

bands around the shells.  At the time of the invention, prior art would have made these processes

obvious to a person with ordinary skill in the art.  They are therefore unpatentable.

## BACKGROUND

**A.      Overview of the Procedures for Applying for and Obtaining a Patent**

An inventor seeking a patent must file a patent application with the USPTO.  The

application is, essentially, a draft patent.  Like a patent, it contains two primary parts:  (1) a

"specification;" and (2) one or more "claims."  The specification describes the invention, and

teaches how to make and use it:

> The specification shall contain a *written description* of the
> invention, and of the manner and process of making and using it,
> in such full, clear, concise and exact terms as to *enable* any person
> skilled in the art [technology] to which it pertains, or with which it
> is most nearly connected, to make and use the same, and shall set
> forth the best mode contemplated by the inventor of carrying out
> his invention."

35 U.S.C. § 112, first paragraph (emphasis added).

2

The claims, on the other hand, identify what the applicant regards as his invention; *i.e.*, the scope of legal protection the applicant believes his invention is entitled to receive. 35 U.S.C. § 112, second paragraph. Each claim is a single sentence that contains a number of "limitations" directed to the various features of the subject matter claimed. 35 U.S.C. § 112; *Hyatt v. Dudas*, Civ. No. 03-0901, 2005 WL 5569663, at *2 (D.D.C. Sept. 30, 2005). Several claims in a single application may share many of the same limitations. *Id.* A claim may appear in independent or dependent form. An independent claim, as the name suggests, stands on its own, reciting all the limitations of the invention. By contrast, a dependent claim incorporates the limitations of the independent claim and recites one or more further limitations of the invention.

When the application is received by the USPTO, it is given to a patent examiner for examination. 35 U.S.C. § 131. The examiner determines whether each claim satisfies certain statutory patentability requirements. For example, the examiner will determine whether each claimed invention is "novel," *i.e.*, new, and also whether it would have been "nonobvious" to a person of ordinary skill in the relevant art at the time it was made. 35 U.S.C. §§ 102, 103. Section 102 of the Patent Statute sets forth the types of evidence – *e.g.*, earlier-issued patents, articles published in relevant technical journals, etc. – that the examiner may properly rely upon in rejecting a claim as "anticipated" (not novel) or obvious. 35 U.S.C. § 102. This evidence is referred to as "prior art." *See* 37 C.F.R. § 1.104(a)(1).

If the examiner believes that a claim does not comply with the statutory patentability requirements, the examiner will reject the claim and issue an "office action" setting forth the grounds for the rejection. 35 U.S.C. § 132(a); 37 C.F.R. § 1.104(a). In response, the applicant may (i) amend the rejected claim to distinguish it over the prior art that the examiner relied upon;

3

and/or (ii) argue against the rejection.  37 C.F.R. § 1.111.  The examiner will eventually issue a

"final office action" if the examiner and the applicant cannot agree on the patentability of one or

more claims.  37 C.F.R. § 1.113.  Otherwise, the examiner will "allow" the pending claims, and

the USPTO will issue a patent for the claimed invention.

      An applicant may appeal a final office action to the Board.  35 U.S.C. § 134.  The Board

will either sustain or reverse the examiner's rejections.  35 U.S.C. § 134(a).  If the Board sustains

the  examiner's rejections, the applicant may either appeal directly to the Court of Appeals for

the Federal Circuit ("Federal Circuit") under 35 U.S.C. § 141, or, as in the present case, proceed

with an action in the District Court for the District of Columbia under 35 U.S.C. § 145.

**B.**      **Factual Background**

      **1.**      **The '725 Application**

            **a.**      **The Invention as Described in the '725 Application**

      Ernest A. Voisin filed U.S. Patent application No. 09/121,725 ("the '725 application"),

entitled "A Process of Elimination of Bacteria in Shellfish, of Shucking Shellfish and an

Apparatus Therefor," on May 8, 2003.  R1356-91.  The '725 application is a continuation of an

application having the same number filed on July 25, 1998.[2]  *Id.*

      The specification of the '725 application discloses a process for eliminating harmful

bacteria in shellfish, such as oysters, by exposing the shellfish to high pressure for a limited

---

    [2]  Innovatit has already received four patents based at least in part on the original '725 application:  (1) U.S. Patent No. 6,217,435, which claims a method of shucking raw oysters using high pressure; (2) U.S. Patent No. 6,426,103, which claims a method of destroying harmful bacteria in raw shellfish by exposing the shellfish to high pressure at above ambient temperatures; (3) U.S. Patent No. 6,537,601, which claims a method of destroying harmful bacteria in raw shellfish using high pressure and the application of heat; and (4) U.S. Patent No. 6,393,977, which claims an apparatus for processing raw food using high pressure.

period of time, without applying heat.  R1388.  The specification notes that bacteria from the

*Vibrio* genus, such as *Vibrio vulnificus*, which are found in warm coastal waters around the U.S.,

are of particular concern.  R1365.  Eating raw oysters infected by the *Vibrio vulnificus* bacteria

may cause food poisoning that, in rare cases, is fatal.  R1366.  According to the specification, the

claimed high pressure process kills the bacteria on the surface of or harbored within the shellfish,

without destroying the "sensory qualities" of raw shellfish.  R1372.

> **b.**    **Claims at Issue**

After a "preliminary amendment" (an amendment prior to the examiner's first office

action), Innovatit presented claims 3, 4, 6, 7, and 27 for examination.  Independent Claim 27 is

representative:

> A process of treating raw molluscan shellfish, comprising the steps
> of:
>
> depositing the raw molluscan shellfish into a pressure vessel and
> pressurizing the pressure vessel to between 20,000 p.s.i. and
> 80,000 p.s.i. for 1 - 15 minutes without application of heat at
> ambient temperature, without causing thermal and mechanical
> damage to the raw molluscan shellfish, while eliminating
> pathogenic naturally-occurring marine bacteria in said raw
> molluscan shellfish, and while retaining sensory characteristics of
> said raw molluscan shellfish.

R1595.  Independent claim 3 is similar to claim 27, and adds the process step of retaining the

processed shellfish at a temperature below ambient temperature – *e.g.*, refrigeration.  R1594.

Claim 4 depends from claim 3, and is further limited to a pressurization process sufficient to

eliminate *Vibrio*[3] bacteria.  *Id.*  Independent claim 6 is similar to claim 27, but is specifically

---

[3] Innovatit uses the term "Vibriones" in claim 4, elsewhere in the '725 application, and
in its communications with the examiner and the Board.  *See, e.g.*, R1004.  The USPTO
understands that "Vibriones" refers to members of the *Vibrio* genus of bacteria.  *See, e.g.*,

directed to the treatment of oysters and to the elimination of *Vibrio* bacteria. *Id.* Claim 7

depends from Claim 6, and adds the process step of "banding" the oysters and enclosing them in

liquid-impermeable bags prior to pressurization. *Id.*

**c.    The Prior Art of Record**

**i.    Japanese Patent Application 4356156A Teaches a
Process of Pressurizing Shellfish That Inherently
Destroys Bacteria**

Japanese Patent Application 4356156A to Yasushi et al. ("JP '156")  teaches a method of

shucking raw shellfish, such as oysters, by exposing them to pressures of between about 1000

and 4000 "normal atmospheres" (14,200 to 56,800 p.s.i.) for about 0.5 minutes to 10 minutes.

R1146-47.  More specifically, JP '156 teaches that when pressurizing shellfish to 2000 normal

atmospheres (28,440 p.s.i.), the  pressure is to be maintained for 3 to 10 minutes; when

pressurizing to 3000 normal atmospheres (42,660 p.s.i.), the pressure is maintained for 0.5 to 3

minutes; and when pressurizing to 4000 normal atmospheres (56,880 p.s.i.), the pressure is

maintained for 0.5 to 3 minutes.  R1147.  JP '156 discloses a specific embodiment,

"Embodiment 1," in which (i) oysters in the shell are placed in a plastic bag with sea water;

(ii) the bag is sealed and placed in a high pressure processing device; and (iii) a pressure of 3000

normal atmospheres, or approximately 42,660 p.s.i., is applied to the oysters for three minutes.

R1149.  The oysters are rendered easy to open with fingers but still raw.  R1150.

**ii.    U.S. Patent No. 5,773,064 to Tesvich *et al.* Teaches
Banding Shellfish and Refrigeration of Shellfish in
Connection with a Heat-treatment Process**

U.S. Patent No. 5,773,064 to Tesvich et al. ("the Tesvich '064 patent" or "Tesvich")

---

R1003, lines 9-10.

6

discloses a method of destroying *Vibrio vulnificus* bacteria on molluscan shellfish, while leaving

the shellfish meat in a raw state.  R56-A - H.[4]  This method uses "mild heat treatment" followed

by rapid cool-down and cold storage.  R56-E, col. 2, lines 31-36; R56-G, col. 5, line 57 - col. 6,

line 7.  The mollusks have a band placed around the shells to keep them closed during treatment.

R56-G, col. 5, lines 14-18, 42-47.  The treatment duration and temperatures are selected so as to

not cook the shellfish.  *Id.*, col. 5, lines 50-52.  When consumed, the mollusks retain their

"natural flavor and raw texture."  *Id.*, col. 6, lines 15-18.

> ### d.    The Examination of the Pending Claims

The examiner rejected all of the pending claims in an office action dated June 6, 2003.

The examiner rejected claims 6 and 27 as anticipated by JP '156.  R1397.  The examiner noted

that the method steps taught by JP '156 are the same as those recited in claims 6 and 27.  R1397.

The examiner further noted that although JP '156 does not recite an effect upon *Vibrio* bacteria,

such an effect would have inherently occurred as a result of the JP '156 process.  *Id.*  That is, the

examiner found that one of ordinary skill in the art would expect the JP'156 process to

necessarily eliminate *Vibrio* bacteria because  JP '156 employs the same steps as the claimed

method.  *Id.*

The examiner rejected claims 3, 4, and 7 as obvious over JP '156 in view of the Tesvich

'064 patent.  Acknowledging that JP '156 does not teach the step of refrigeration of the shellfish

after treatment or the step of banding the shellfish before treatment, the examiner found that

Tesvich '064 nonetheless makes clear that such steps were known in the art when the '725

---

[4]  The Tesvich '064 Patent is found in the administrative record filed in *Innovatit Seafood Systems, LLC v. Dudas*, No. 06-825, at R56A-H.  For the Court's convenience, a copy of this reference is also attached as Exhibit A hereto.

application was filed.  R1398-99.  The examiner also found that it would have been obvious to a person of ordinary skill to combine the refrigeration of Tesvich '064 with JP '156 since both references are directed to methods of processing raw shellfish, and since refrigeration was a common method of preserving raw foods at the time of the invention.  R1398.  The examiner further found that it would have been obvious to a person of ordinary skill to combine the use of bands as taught by Tesvich '064 with JP '156, since JP '156 observed that shellfish opened during processing, and since banding was a known method of keeping shellfish closed during processing.  R1399.

On October 6, 2003, Innovatit responded to the examiner's rejection by submitting four declarations from persons allegedly skilled in the art of processing shellfish.  These declarations, submitted by LeRoy Chauvin, Michael Voisin, Alfred Sunseri, and Christopher Nelson, (hereinafter, "the CVSN Declarations"), are identical except for introductory paragraphs that set forth the experience of the declarants.  R1412-21.  The CVSN Declarations challenged the examiner's conclusion that the elimination of *Vibrio* bacteria is an inherent result of the JP '156 process.  R1407-09; R1412-21.  According to Innovatit, the CVSN Declarations all contended that a person of ordinary skill in the art at the time of Innovatit's invention would not have recognized the elimination of *Vibrio* bacteria as an inherent result of JP '156.  *Id.*  Innovatit also relied on the CVSN Declarations in responding to the examiner's rejection of claims 3, 4, and 7 on obviousness grounds.  Specifically, it relied on the declarants' statement that:

> [I]t would not have been obvious to a person familiar with seafood industry to pressurize seafood at 20,000 p.s.i. and 80,000 p.s.i., without application of heat, without causing damage to shellfish, for a period of time between 1 and 15 minutes in order to destroy bacteria in raw molluscan shellfish after having reviewed [JP '156] and Tesvich.  The mere fact that Tesvich suggests banding and

> refrigeration of seafood after "mild heat treatment" does not
> change the result – neither [JP '156] nor Tesvich, singularly or
> combined together, suggest, make inherent or obvious what Mr.
> Voisin's claims 3, 4, and 7 teach.

R1410.

The examiner rejected Innovatit's arguments in a final office action dated October 27, 2003. R1423-28. The examiner found that Innovatit's CVSN Declarations were insufficient to overcome the § 102 rejection of claims 6 and 27 and the § 103 rejection of claims 3, 4, and 7. R1424-27. The examiner explained that since the process steps of JP '156 are the same as those claimed, one of ordinary skill in the art would have expected the same results, *i.e.*, elimination of *Vibrio* bacteria in shellfish. *Id.* The examiner further noted that it would have been obvious for a person of ordinary skill in the art to combine the refrigeration and banding steps of Tesvich with the pressurization method of JP '156. R1426.

## 2. Innovatit's Appeal to the Board

Innovatit appealed the examiner's final rejection to the Board. R1466. Relying on the CVSN Declarations previously submitted to the examiner, Innovatit reiterated its argument that a person of ordinary skill in the art would not have appreciated from JP '156 that the disclosed process inherently destroys *Vibrio* bacteria. R1588-89. Innovatit also argued that JP '156 was not "enabled," because "undue experimentation" was required in order to determine the appropriate pressure, temperature, and duration of pressurization needed to consistently shuck oysters. R1583-87. In support of this argument, Innovatit submitted the declaration of the inventor, Ernest Voisin ("the Inventor Declaration," R1596-97), and Japanese Patent 2000157157A to Shitsuetsu *et al.* ("Shitsuetsu," R1601-29).

In his declaration, Inventor Voisin stated, *inter alia*, that he pressurized oysters to 3000

9

atmospheres for "0.5 to 5 minutes" in accordance with the teachings of JP '156. R1597. He

conducted this test at 50 °F, which he characterized as "ambient" temperature. As a result of

this pressurization, 80% of the tested oysters were shucked. *Id.* Inventor Voisin concluded from

this and similar test results that the method of JP '156 was "commercially uncertain." R1434.

Shitsuetsu discloses a method of opening raw oysters and other bivalves through the

application of heat and pressure in a way that does not cook the shellfish meat. R1601.

According to the reference, the use of pressure together with heat permits the use of lower

pressure as compared to the use of pressure alone (*i.e.*, without the application of heat, as

disclosed in JP '156). R1605-06. According to Innovatit, Shitsuetsu supports the inventor's test

results, which purported to show that some application of heat was necessary to shuck raw

oysters. R1584.

### 3.    The Board Decision

The Board affirmed the examiner's rejection of the relevant claims under 35 U.S.C. §§

102(b) and 103(a). R1664-75. As to the examiner's rejection of claims 6 and 27 on anticipation

grounds, the Board agreed with the examiner that JP '156, and particularly Embodiment 1

thereof, discloses the same process steps as that of Innovatit's claims. R1672. The Board

further agreed with the examiner that the process of JP '156 necessarily kills pathogenic *Vibrio*

bacteria to the same extent as Innovatit's claims. R1668, 1672.

The Board then considered the arguments and evidence Innovatit had offered to rebut the

examiner's *prima facie* case of anticipation, and found neither to be persuasive. R1670. The

Board acknowledged that a prior art reference must be "enabling" to be prior art under 35 U.S.C.

§ 102(b), meaning that "the reference must put the claimed invention in the hands of one skilled

in the art." R1670 (internal citations omitted). *Id.* The Board reasoned that Innovatit's "claimed invention" is "a process of treating raw oysters in a shell by use of high pressure for a specific time and temperature." *Id.* The Board observed that Innovatit's evidence purporting to show that JP '156 was not enabling – the Inventor Declaration and Shitsuetsu – concerned only whether the process of JP '156 was successful, *i.e.*, resulted in 100% shucked oysters at every disclosed pressure, and did *not* address whether JP '156 sufficiently teaches a person of ordinary skill to perform the process itself. *Id.* Accordingly, the Board found this evidence to be irrelevant.

Next, the Board noted that even if that evidence were relevant, it suffered from numerous deficiencies. For example, the Board observed that Inventor Voisin performed his tests at 50 °F, even though there was no evidence showing that JP '156 employed that same temperature. R1671. The Board further noted that the Inventor Declaration demonstrates that the process disclosed in JP '156 *was* successful in shucking oysters, in that it indicated that 80% of oysters tested were shucked at the pressure and duration conditions exemplified in Embodiment 1 of JP '156. *Id.*

The Board further observed that Innovatit failed to provide any evidence – other than the conclusory CVSN Declarations – to rebut the examiner's *prima facie* case that the process of JP '156 inherently results in the elimination of pathogenic bacteria. R1671-72. The Board explained that the Declarations "merely conclude that the method steps disclosed by JP '156 do not inherently eliminate bacteria in shellfish but fail to present any evidence to support this conclusion." R1672.

With respect to the examiner's obviousness rejection of claims 3, 4, and 7, the Board

11

noted that Innovatit did not contest or dispute the examiner's findings regarding the Tesvich '064 patent, but only repeated the inherency and enablement arguments raised with respect to anticipation. R1672. The Board accordingly affirmed the examiner's obviousness rejection of these claims. *Id.*

## STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Fund for Animals v. Williams*, 246 F. Supp. 2d. 27, 33 (D.D.C. 2003); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. Upon that showing, the nonmoving party must present evidence showing the existence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio* Corp., 475 U.S. 574, 586 (1986). Mere denials or conclusory statement are insufficient to create a genuine issue of material fact. *See, e.g.*, *Burke v. Gould*, 286 F.3d 513, 517-20 (D.C. Cir. 2002); *Hayes v. Shalala*, 902 F. Supp. 259, 263 (1995); *Barmag Barmer Maschinefabrik AG v. Murata Mach.*, 731 F.2d 831, 836 (Fed. Cir. 1984). Similarly, if the nonmoving party's evidence is not significantly probative, summary judgment can be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). If the record taken as a whole could not lead the Court to find for the nonmoving party, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

12

**B.**      **Standards Governing Review of Actions Brought Pursuant to 35 U.S.C. § 145**

Although most patent applicants dissatisfied with a Board decision typically appeal that decision directly to the Federal Circuit, Innovatit brings the present action to this Court under 35 U.S.C. § 145.  It is still, however, an appeal of an agency action in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.  See Mazzari v. Rogan*, 323 F.3d 1000, 1004 (Fed. Cir. 2003) (holding that the USPTO is an agency subject to the APA, and therefore "a reviewing court must apply the APA's court/agency review standards"). Accordingly, the Court may set aside legal actions of the Board that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and may set aside factual findings only when they are "unsupported by substantial evidence."  5 U.S.C. § 706 (2000); *Mazzari*, 323 F.3d at 1005; *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).  If the parties present additional evidence to the Court, which on a review under Section 145 may be done only in limited circumstances, the court must make "*de novo* factual findings if the evidence is conflicting."  *Mazzar*i, 323 F.3d at 1004; *see also Gould v. Quigg*, 822 F.2d 1074, 1077 (Fed. Cir. 1987); *Hyatt v. Dudas,* 393 F. Supp. 2d 1, 6 (D.D.C. 2005).  Plaintiff bears the burden of showing that the Board committed reversible error.  *Fregeau v. Mossinghof*, 776 F.2d 1034, 1038 (Fed. Cir. 1985).

## ARGUMENT

**I.      SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT CLAIMS 6 AND 27 ARE ANTICIPATED BY JP '156.**

A determination that a claim is anticipated under 35 U.S.C. § 102 requires a finding that each and every limitation is found either expressly or inherently in a single prior art reference. *Transclean Corp. v. Bridgewood Serv., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002).  Anticipation

13

is a question of fact.  The Board's finding of anticipation must therefore be upheld if supported by substantial evidence.  *Gartside*, 203 F.3d at 1316.

Claim 27 recites a process for pressurizing shellfish to between 20,000 and 80,000 p.s.i. for 1 to 15 minutes, at ambient temperature (*i.e.*, without the application of heat), to eliminate pathogenic bacteria on the shellfish, while retaining sensory characteristics of raw shellfish (*i.e.*, without cooking the shellfish).  R1595.  Claim 6 is substantially the same as claim 27, but is further limited to the treatment of oysters and to the elimination of *Vibrio* bacteria.  R1594. JP '156 discloses each of the limitations of claims 6 and 27, either expressly or inherently.

### A.    JP '156 Expressly Discloses All of the Limitations of Claims 6 and 27, Except the Elimination of Harmful Bacteria

JP '156 teaches a method of shucking oysters and other shellfish by pressurizing them to between about 14,200 p.s.i. to 56,800 p.s.i. for 0.5 minutes to 10 minutes, without the application of heat, in such a way that the shellfish remain raw after processing.  R1146-50.  More specifically, JP '156 teaches that when pressurizing shellfish to 2000 normal atmospheres (28,440 p.s.i.), the pressure is to be maintained for 3-10 minutes; when pressurizing to 3000 normal atmospheres (42, 660 p.s.i.), the pressure is maintained for 0.5 to 3 minutes; and when pressurizing to 4000 normal atmospheres (56,880 p.s.i.), the pressure is maintained for 0.5 to 3 minutes.  R1147.  The pressure/duration envelope defined by these values is depicted in Figure 1, below,  along with the pressure duration envelope of Innovatit's claims (20,000 - 80,000 p.s.i. for 1 to 15 minutes).[5]

---

[5] Figure 1 was prepared by Defendant's counsel for the purpose of graphically representing the fact that Innovatit's claimed pressure/duration envelope overlaps with that disclosed in JP '156.



**Figure 1.** The shaded rectangle depicts the pressure/duration envelope of Innovatit's claims. The area enclosed by the bold line depicts the pressure/duration envelope disclosed in JP '156.

15

JP '156 discloses a specific embodiment, "Embodiment 1," in which (i) oysters in the shell are placed in a plastic bag with sea water; (ii) the bag is sealed and placed in a high pressure processing device, and (iii) the oysters are pressurized at 3000 normal atmospheres, or approximately 42,660 p.s.i., for three minutes.  R1149.  The pressure and duration values of Embodiment 1 are also depicted in Figure 1.

It is well settled that disclosure in the prior art of *any* specific value within a claimed range expressly anticipates the claimed range.  *See Titanium Metals Corp. v. Banner*, 778 F.2d 775, 781-2 (Fed. Cir. 1985) (holding that prior art article disclosing titanium base alloy containing 0.25% Mo and 0.75% Ni anticipates claims to a titanium base alloy containing from 0.2 - 0.4% Mo and from 0.6-0.9% Ni); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1350-51 (Fed. Cir. 2002) (applying *Titanium Metals* to process claims).  Not only do the pressure and duration ranges of JP '156 substantially overlap those of Innovatit's claims, the specific pressure and duration parameters of Embodiment 1 of JP '156 – 42,660 p.s.i. for three minutes – are *squarely within* the pressure and duration ranges of Innovatit's claims.  *See* Figure 1.  Thus, there can be no doubt under *Titanium Metals* that JP '156 anticipates Innovatit's claimed pressure and duration ranges.  Further, JP '156 states that shellfish treated according to its process remain raw, exactly like the shellfish treated according to Innovatit's claimed process.  R1150.  Hence, JP '156 *expressly* discloses all of the limitations of claims 6 and 27 except for the elimination of pathogenic bacteria.

**B.    JP '156 Inherently Discloses the Elimination of Pathogenic Bacteria**

A prior art reference may anticipate when the claim limitations not expressly found in that reference are nonetheless *inherent* in it.  *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002).  "Under the principles of inherency, if the prior art necessarily functions

in accordance with, or includes, the claimed limitations, it anticipates." *Id.* (citing

*MEHL/Biophile v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)). "Inherency is not

necessarily coterminous with the knowledge of those of ordinary skill in the art. Artisans of

ordinary skill may not recognize the inherent characteristics or functioning of the prior art." *Id.*;

*see also Abbott Labs. v. Baxter Pharm. Prod., Inc.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006) ("Our

cases have consistently held that a reference may anticipate even when the relevant properties of

the thing disclosed were not appreciated at the time.").

Substantial evidence supports the Board's finding that the elimination of pathogenic

bacteria inherently results from the process disclosed in JP '156. This is primarily because JP

'156, and specifically Embodiment 1 thereof, discloses the *same* process as that set forth in

claims 6 and 27. Thus, to the extent that claims 6 and 27 achieve the elimination of bacteria on

treated shellfish, so does Embodiment 1 of JP '156. *See MEHL/Biophile*, 192 F.3d at 1366

(holding that since the laser operating parameters disclosed in prior art substantially coincide

with those disclosed in the patent, the prior art method achieves hair depilation to the same

extent as the embodiment in the patent). It is significant that Innovatit never argued to the Board

that the high-pressure process of JP '156 would not successfully disinfect treated shellfish. It is

easy to see why: to have done so would have called into question the operability of its own

claims, since those claims recite the same process. Therefore, JP '156 inherently discloses the

elimination of pathogenic bacteria just like Innovatit's claimed process.

17

C.    **An Inherent Result Need Not Be Recognized by a Person of Ordinary Skill in the Art in Order for a Reference to Anticipate**

Innovatit argued to the Board that JP '156 does not inherently disclose the elimination of pathogenic bacteria because a person of ordinary skill in the art at the time of invention would not have recognized that the elimination of pathogenic bacteria necessarily results from the JP '156 process.  R1582, 1588, 1589.  In support of this argument Innovatit submitted the CVSN Declarations, all of which assert:

> It is not inherent in [JP '156] and is not recognized inherent by me, based on my experience and knowledge of seafood processing, that the method steps of [JP '156] would result in elimination of bacteria in molluscan shellfish.

R1413, 1416, 1419, 1421.[6]

The Board correctly rejected this argument.  It is irrelevant to the issue of anticipation whether a person of ordinary skill in the art at the time of the invention would appreciate or recognize an inherent result.  *Cruciferous Sprout Litig.*, 301 F.3d at 1351.  In *Cruciferous Sprout Litigation*, the patents at issue claimed, *inter alia*, a method of preparing cancer-fighting food products "rich in glucosinolates" comprising germinating the seeds of certain broccoli and cauliflower varieties, harvesting the sprouts prior to the two-leaf stage, and using the sprouts in a food product.  *Id.* at 1345.  Foods rich in glucosinolates induce the human body's production of "Phase-2 enzymes," which help the body detoxify carcinogens.  *Id.*  Several prior art references taught growing and eating broccoli sprouts, but did not mention glucosinolates, or the Phase-2-enzyme-inducing potential of the sprouts.  *Id.* at 1349.  The court nonetheless found that the

---

[6]  The fact that all four of the CVSN Declarations contain substantially identical language suggests that they were drafted by counsel rather than by the declarants themselves.

18

prior art references anticipated the asserted claims, since "a sprout's glucosinolate content and Phase 2 enzyme-inducing potential are inherent characteristics of the sprout."  *Id.* at 1350. Importantly, the court held that "it matters not that those of ordinary skill heretofore may not have recognized these inherent characteristics of the sprouts."  *Id.*; *see also MEHL/Biophile*, 192 F.3d at 1366 ("Where, as here, the result is a necessary consequence of what was deliberately intended, it is of no import that the article's authors did not appreciate the results."); *Abbott Labs.*, 471 F.3d at 1368 ("Just as in *Titanium Metals*, that lack of knowledge is wholly irrelevant to the question of whether the 176 patent claims something 'new' over the disclosure of the 211 patent; the claimed property of resistance to degradation is found inherently in the disclosure."). Thus, the Federal Circuit held that the patentee's discovery of a new result, the production of high levels of glucosinolates, from an old process, growing and eating broccoli sprouts, did not entitle the patentee to a patent on the old process.

So too here.  Innovatit's discovery that exposing raw shellfish to high pressure can eliminate pathogenic bacteria in shellfish is simply the discovery of an inherent result, disinfection of shellfish, of an old process, JP '156's use of high pressure on raw shellfish for shucking purposes.  It simply does not matter that the CVSN Declarants thought that a skilled artisan would not have recognized from JP '156 that the method disclosed therein eliminated bacteria in shellfish.  As in *Cruciferous Sprout Litigation*, Innovatit's discovery of an inherent result does not entitle it to a patent on the old process.

**D.    The Process of JP '156 Is Sufficiently "Enabled"**

Innovatit also argued to the Board that JP '156 is "at least partially non-enabling." R1583.  According to Innovatit, the Inventor, Mr. Voisin, pressurized oysters in accordance with

19

the method of JP '156 and allegedly found that such method did not always shuck oysters at every pressure disclosed in JP '156, at least not without the application of heat. The results of Inventor Voisin's testing are allegedly supported by the Shitsuetsu reference.

It is true that a prior art reference must enable a person of ordinary skill in the art to practice the invention in order for the reference to anticipate the invention under 35 U.S.C. § 102. *Schering Corp. v. Geneva Pharma., Inc.*, 339 F.3d 1373, 1380 (Fed. Cir. 2003). But "an anticipatory reference need only enable subject matter that falls within the scope of the claims at issue, nothing more." *Id.* at 1381. This means that JP '156 need *not* teach a method that successfully shucks oysters, because *Innovatit*'s claims do not recite the shucking of oysters.[7] As the Board found, JP '156 need only teach the pressurization process itself in order for it to be a sufficiently enabled prior art reference. R1670. Innovatit never alleged that JP '156 does not adequately teach how to perform the relatively simple pressurization process. Nor could Innovatit make such an argument, since Inventor Voisin was able to carry out that process based on the teachings of JP '156. R1433 (performing tests "following the steps outlined in [JP '156]"). Therefore, it is clear that JP '156 adequately describes the claimed pressurization process.

## II.    CLAIMS 3, 4, AND 7 FOR JP '156 WERE OBVIOUS IN LIGHT OF THE TESVICH '064 PATENT, AND THEREFORE UNPATENTABLE.

A new invention may not be patented if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have

---

[7] In any event, as the Board found, Inventor Voisin's tests *confirm* the operability of the JP '156 process, in that 80% of the tested oysters were shucked when exposed to the pressure utilized in Embodiment 1 of JP '156. R1434.

been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The issue of obviousness is a legal question based on underlying factual findings. *See Gartside*, 203 F.3d at 1316. "Underlying facts include the scope and content of the prior art, the level of ordinary skill in the art at the time of the invention, objective evidence of nonobviousness, and differences between the prior art and the claimed subject matter." *In re Icon Health and Fitness, Inc.*, __F.3d ___, 2007 WL 2189161 at *2 (Aug. 1, 2007).

"The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1739 (2007). However, "a patent composed of several elements is not proved obvious merely be demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 1741. Accordingly, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.*

Claims 3 and 4 are virtually identical to claims 27 and 6, respectively, adding only a process step of refrigerating the shellfish after treatment. R1594. Claim 7 depends from, and is substantially the same as, claim 6, further adding process steps directed to banding and bagging the shellfish prior to treatment. *Id.* As discussed above, JP '156 expressly or inherently discloses all of the process steps of claims 3, 4, and 7 except for the refrigeration and banding steps.[8]

The examiner specifically found that Tesvich teaches the missing refrigeration and

---

[8] JP '156 teaches bagging the oysters prior to pressurization. R1149.

banding steps.  R1426 (citing Tesvich, Fig. 1, no. 18 and col. 2, lines 53-65); R1637 (citing

same).  The examiner also found that a person of ordinary skill in the art would be motivated to

combine the pressurization process of JP '156 with the refrigeration and banding steps of

Tesvich.  R1426, 1637.  These findings are apparently undisputed, since Innovatit did not

challenge them in its appeal to the Board.[9]  *See* R1581-93.  Indeed, the Board adopted these

findings in affirming the examiner's obviousness rejections of claims 3, 4, and 7.  R1673.

　　　　With respect to claims 3 and 4, the Board's findings regarding the teaching of Tesvich

and the motivation of a person of ordinary skill in the art to combine Tesvich with JP '156 are

supported by substantial evidence.  *See In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2002)

("The presence or absence of a motivation to combine references in an obviousness

determination is a pure question of fact.").  Tesvich clearly teaches the refrigeration of raw

oysters following treatment and prior to consumption.  *See* Exh. A (Tesvich '064) col. 5, lines

14-18 and col. 6, lines 8-18.  Since the process of treating oysters disclosed in JP '156 does not

cook the oysters, refrigeration would naturally have been required following treatment to

preserve the oysters prior to consumption.  *See id.*  Thus, a person of ordinary skill in the art

would have been motivated to combine the refrigeration step of Tesvich with the pressurization

process of JP '156, rendering claims 3 and 4 obvious.

　　　　With regard to claim 7, it was known that oysters would open during pressurization.

---

[9]  In failing to dispute that Tesvich teaches the refrigeration and banding steps, and that a
person of ordinary skill in the art would have been motivated to combine Tesvich and JP '156,
Innovatit has waived the right to present evidence on these issues and argue them on appeal to
this Court.  *See MacKay v. Quigg*, 641 F.Supp. 567, 570 (D.D.C. 1986) (holding that a plaintiff
in a section 145 action is "*precluded from presenting new issues*, at least in the absence of some
reason of justice put forward for failure to present the issue to the Patent Office" (emphasis in
original)).

R1148-49 (JP '156, ¶0009).  Tesvich teaches that it is desirable to process raw oysters in the

shell, and keep the shells closed during processing, for three reasons:  (a) to preserve the oysters

"liquor" (col. 2, lines 1-5); (b) to permit the mollusk to be served on the half-shell in a raw state

(a "favorite consumer food") (col. 6, lines 28-32); and (c) to prevent contamination and product

degradation during processing (col. 3, line 67 - col. 4, line 4).  Thus, a person of ordinary skill in

the art would have been motivated to combine the pressurization method of JP '156 with the

banding step of Tesvich to keep the oyster shells closed during pressurization.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court enter an order

granting summary judgment to defendant.

Respectfully submitted,

___/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

___/s/_____
RUDOLPH  CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514-7198
202/514-8780 (facsimile)

Of Counsel:

STEPHEN WALSH
Acting Solicitor

23

BENJAMIN D. M. WOOD
JANET GONGOLA
Associate Solicitors
United States Patent and Trademark Office

Dated: November 2, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INNOVATIT SEAFOOD | ) | |
| SYSTEMS, LLC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-0822 (JR) |
| | ) | |
| DIRECTOR, UNITED STATES | ) | |
| PATENT AND TRADEMARK | ) | |
| OFFICE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER [PROPOSED]

Upon consideration of defendant's motion for summary judgment, plaintiff's response thereto, and the entire record in this matter, it is this _____ day of _____, 200__,  hereby

ORDERED that defendant's motion for summary judgment is GRANTED; and it is

FURTHER ORDERED that plaintiff's complaint is DISMISSED WITH PREJUDICE.

SO ORDERED.

_____
United States District Judge

: