**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-0822(JR) |
| | ) | |
| COMMISSIONER FOR PATENTS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................i

I.      PARTIES ...................................................................................................................1

II.     ISSUES .....................................................................................................................1

III.    INTRODUCTION .....................................................................................................2

IV.     APPLICABLE LAW .................................................................................................6

        A.      Anticipation Under 35 U.S.C. § 102 .............................................................7

        B.      Inherent Anticipation ....................................................................................8

        C.      Enablement ...................................................................................................9

        D.      Obviousness Under 35 U.S.C. § 103 ...........................................................10

V.      STATEMENT OF MATERIAL FACTS ....................................................................11

VI.     ARGUMENT.............................................................................................................13

        1.      35 U.S.C. § 100(b) Provides For Issuance of Patent on a New Use of a Known
                Process ........................................................................................................13

        2.      The Method of JP '156 Does Not Encompass the Instant Process ........................14

3.    Defendant's Use of the Extrinsic Reference to Assert Inherency is Nothing More Than an Obviousness Argument in Disguise ...................................................16

4.    Persons Skilled in the Art of Seafood Processing Do Not Recognize JP '156 as "Inherently, Inevitably" Leading to the Result Recited in Voisin's Claims ..........17

5.    Defendant Cannot Prove That Missing Elements Are Inherent in the Disclosures of the JP '156 Application and Cheftel's Paragraph Headings.............................22

6.    The Cited Reference Does Not Provide an Enabling Disclosure .........................23

7.    The PTO's Obviousness Rejection Ignores the Evidence of Record ...................24

VII.    CONCLUSION AND PRAYER FOR RELIEF ................................................28

# TABLE OF AUTHORITIES

## CASES

Akzo N.V. v. United States Int'l Trade Comm'n, 808 F.2d at 1479. ...................................... 9, 20

Atlas Powder Co. v. Ireco Inc., 190 F.3d 1342, 1347 (Fed. Cir. 1999). ...................................... 22

Atofina v. Great Lakes Chem. Corp., 78 U.S.P.Q.2d 1417 (Fed. Cir. 2006) .............................. 14

Baxter Travenol Labs., 952 F.2d 388, 390 (Fed. Cir. 1991)....................................................... 20

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................................. 6

Continental Can Co. USA v. Monsanto Co.,
     948 F.2d 1264, 1268 (Fed. Cir. 1991)....................................................... 8, 16, 20, 22

Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1376 (Fed. Cir. 2002) .....................11

Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical Education and Research,
     304 F.3d 1221, 1227 (Fed. Cir. 2002)........................................................................ 7

Elan Pharmaceuticals, Inc. v. Mayo Foundation,
     346 f.3d 1051, 1054-55 (Fed. Cir. 2003) ........................................................... 8, 9, 19

Eli Lilly & Co. v. Zenith Goldline Pharm., Inc., 471 F.3d 1369, 1380 (Fed. Cir. 2006) ............. 27

Gartside, 203 F.3d 1305, 1316 (Fed. Cir. 2000) ........................................................................... 7

Graham v. John Deere Co., 383 U.S. 1, 17 (1966) ............................................................... 10, 27

Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339 (Fed. Cir. 2000)..................................................... 9

Hitzeman v. Rutter, 243 F.3d 1345, 1355 (Fed. Cir. 2001) ....................................................... 21

Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1138 (Fed. Cir. 1985) ............................... 21

King, 801 F.2d 1324, 1326 (Fed. Cir. 1986)............................................................................... 23

Knoll Pharmaceutical Co. v. Teva Pharmaceuticals USCA, Inc.,
     367 F.3d 1381, 1384 (Fed. Cir. 2004)...................................................................... 10

KSR International Co. v. Teleflex Inc., 127 S. Ct. 1727, 1734 (2007)................ 10, 11, 24, 26, 27

Mazzari v. Rogan, 323 F.3d 1000, 1004 (Fed. Cir. 2003) ............................................................ 7

MEHL/Biophile Int'l Corp. v Milgraum, 192 F.3d 1362 (Fed. Cir. 1999) ............................. 15, 16

Mentor H/S, Inc. v. Med. Device Alliance, Inc., 244 F.3d 1365, 1376 (Fed. Cir. 2001) ............... 8

Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,
    976 F.2d 1559, 1572 (Fed. Cir. 1992) ....................................................................... 8

Paperless Accounting, Inc. v. Bay Area Rapid Transit Sys.,
    804 F.2d 659, 665 (Fed.Cir.1986) ............................................................................. 9

Perricone v. Medics Pharmaceutical Corp., 432 F.3d 1368, 1375-76 (Fed. Cir. 2005) ........... 8, 22

PharmaStem Therapeutics, Inc. v. Viacell, Inc., 491 F.3d 1342, 1359 (Fed. Cir. 2007)............... 8

Rhoads v. McFerran, 517 F.2d 66, 67 (2d Cir. 1975). .................................................... 7

Robertson, 169 F.3d 743, 745 (Fed. Cir. 1999) ......................................................... 8, 21

Robotic Vision Sys., Inc. v. View Eng'g., 189 F.3d 1370, 1377 (Fed. Cir. 1999) ...................... 10

Rosco, Inc. v. Mirror Lite Co., 304 F.3d 1373, 1380 (Fed. Cir. 2002)................................... 8

Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997)....................................................... 8

Samour, 571 F.2d 559, 562 (CCPA 1978) ................................................................ 20

Scripps Clinic & Research Foundation v. Genentech, Inc.,
    927 F.2d 1565, 1576 (Fed. Cir. 1991)................................................................. 7, 16

Seymour v. Osborne, 11 Wall. 516, 78 U.S. 516, 20 L.Ed. 33 (1870) .................................. 9

Titanium Metals Corp. v. Banner, 778 F.2d 775, 780 (Fed. Cir. 1985) ................................ 17

Transclean Corp. v. Bridgewood Servs., Inc., 290 F.3d 1364, 1373 (Fed. Cir. 2002) ................ 21

Trintec Indus. Inc. v. Top-U.S.A. Corp., 295 F.3d 1292, 1295 (Fed. Cir. 2002) ...................... 8

Waterhouse v. District of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002) ............................... 6


OTHER AUTHORITIES

Administrative Procedure Act ("APA") .................................................................... 7

Donald S. Chisum, Chisum on Patents § 3.02 ........................................................... 17

## RULES

35 U.S.C. § 100 ................................................................................................................. 13, 14

35 U.S.C. § 101 ........................................................................................................... 13, 14, 23

35 U.S.C. § 102 and 102(b) .......................................................................................... 1, 7, 11, 16

35 U.S.C. § 103 and 103(a) ...................................................................................... 1, 10, 11, 13, 16

35 U.S.C. § 706 ...................................................................................................................... 7

Federal Rule of Civil Procedure 56 ...................................................................................... 1, 6

Local Rule LCvR7(h) ............................................................................................................. 1

Local Rules LCvR-56.1 .......................................................................................................... 1

## I.    PARTIES

Plaintiff Innovatit Seafood Systems, Inc. ("Innovatit" or "Plaintiff") and the current assignee of the application-in-suit, Avure Technologies, Inc. ("Avure"), by their undersigned counsel, respectfully move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rules LCvR-56.1 and the Minute Order of August 28, 2007, seeking an Order that Claims 3, 4, 6, 7 and 27 of the application-in-suit – U.S. Patent Application No. 09/121,725 (Exhibit 1) are not anticipated under 35 U.S.C. § 102(b) and are not obvious under 35 U.S.C. § 103 (a).

## II.    ISSUES

The issues presented here are:

(1)    whether the asserted Claims 6 and 27 of the application-in-suit are anticipated under 35 U.S.C. § 102(b), either expressly or inherently, by Japanese application publication No. JP 4356156A ("JP '156")? (Exhibit 2)

(2)    whether the asserted Claims 3, 4 and 7 of the application-in-suit are obvious in view of JP '156?

(3)    whether the actions of the Board in affirming the Examiner's rejection of the claims are arbitrary, capricious, an abuse of discretion, and not in accordance with law?

(4)    whether the actions of the Board in affirming The Examiner's rejection of the claims are unsupported by substantial evidence presented by the Plaintiff?

The Plaintiff submits that there are no genuine issues of fact that would prevent this Court from granting the Plaintiff's motion as a matter of law over any countervailing arguments that the Director of the U.S. Patent Office ("PTO" or "Defendant") may assert. The Defendant simply cannot satisfy its burden of producing prima facie evidence of anticipation or obviousness

of the claims of the application-in-suit. Even assuming that such prima facie showing has been made, the Plaintiff successfully traversed the rejections by presenting substantial evidence from persons of skill in the art. Therefore, the PTO's actions cannot be classified other than arbitrary, capricious, an abuse of discretion and/or unsupported by the substantial evidence presented by the Plaintiff. As outlined below, the undisputed facts and evidence of record establish that JP '156 does not disclose, either expressly or inherently, and within the four corners of the documents, every limitation of the asserted claims of the application-in-suit as necessary to render the claims anticipated. As also outlined below, the claims are not made obvious by the disclosure of the Japanese application because the applicant submitted ample evidence that one of ordinary skill in the art would not have expected the same results of bacteria elimination after reading the Japanese reference.

### III.    INTRODUCTION

The Plaintiff was and Avure is, the current assignee of the entire right, title and interest in and to the invention of Ernest A. Voisin relating to a process for eliminating pathogenic bacteria in shellfish, the application-in-suit herein. Because the technology involved in this lawsuit is of immense value, not only to food safety and public health, but also to interstate commerce, the following brief background is provided.

In recent years, considerable attention has been paid in the media to tragic results of consumption of raw oysters where the individuals became infected with life-threatening pathogenic organisms. Such bacteria as *Vibrio vulnificus* and *Vibrio parahaemolyticus* live in a marine environment, especially in warm waters, usually higher than 25 degrees C. Other organisms of concern are *Vibriones: Vibrio cholerae O1, Vibrio cholerae non-O1, Vibrio mimicus, Vibrio Fluvalis, Vibrio furnissii, Vibrio hollisae, Vibrio alginolyticus, Listeria*

*monocytogenes, Salmonella (nontyphoidal)* and *Salmonella typhi, Campylobacter jejuni, Escherichia coli, Yersinia enterocolitica, Clostridium botilinum, Clostridium perfringens, Shigella, Staphylococcus aureus.*

Some other organisms that can cause disease in normal, healthy adults and which were either isolated from seafood or proven pathogen in seafood are: *Helminths* (*Anisaxis simplex* and other *helminths*); Viruses: *poliovirus*, other *picomaviruses*, Norwalk/Snow Mountain/small round viruses, or SRVs; Hepatitis A and E and non-B Hepatitis, and *bacillus cereus*. Additionally, there is a series of organisms that can cause disease most often in special population groups; these are *rotavirus* and *Listeria*. Some of the above organisms occur naturally in water; some are the result of water pollution, and some are associated with processing and preparation of food, for example cross-contamination or time/temperature abuse, as well as infected food handlers.

*Vibrio Vulnificus* has been isolated from estuarine and marine waters of the U.S. Gulf Coast, East Coast, and West Coast; it was also reported on other continents. The bacteria may transfer from water to the shellfish inhabiting the body of water, especially filter-feeding mollusks, where bacteria can multiply, mostly in the gut region. *Vibrio* is a genus of motile curved and rod-shaped Gram-negative bacteria. Other well-known vibriones are *Vibrio cholerae* and *Vibrio Parahaemolyticus*. *Vibrio cholerae* presents a threat to public health and can even cause an epidemic, if not checked in time. *Vibrio Parahaemolyticus* is a common cause of gastroenteritis in some cultures, where consumption of seafood is particularly high, such as, for example, Japan.

*Vibrio Vulnificus* is a halophilic species, the strains of which are similar to *Vibrio Parahaemolyticus* and *Vibrio alginolyticus*. *Vibrio Vulnificus* thrives in warm waters. Ingesting uncooked or undercooked shellfish that contain vibrios, especially raw oysters, transmits it. After

a brief incubation period, often as short as two hours, *Vibrio Vulnificus* causes septicemia and cellulitis. Physical symptoms include indigestion, cramps, nausea, vomiting, headache, weakness, fever and chills. While fatal outcomes are extremely rare, the unfortunate events have been widely publicized, making the public aware of a potential life-threatening exposure to the *Vibriones* and other pathogens. The fear of bacteria poisoning is so high that the federal government issued a special warning advising the public of the potential dangers of raw oyster consumption. It has also been suggested that no harvesting of oysters be conducted during the warm months in the Gulf of Mexico, so as to minimize the health risk associated with such food poisoning. Public fear of the potential dangers associated with bacteria poisoning through raw oyster consumption adversely affected an important Louisiana industry - oyster harvesting. Market share of Gulf oysters shrunk, and many fishermen found that even oysters harvested from safe beds are not in such a great demand as they used to be and that the price has fallen drastically.

Still, consumption of raw molluscan shellfish and other crustaceans is so widespread in the South that many restaurants continue to carry raw oysters as part of their menu. Even though many restaurants post a warning sign of the possible danger to a segment of the public with liver or immune system disorders, it rarely stops dedicated gourmands.

To prevent poisonous consumption of pathogenic organisms, various methods have been suggested for treating raw shellfish, for example, with heat or irradiation, in an effort to eliminate or minimize the public health danger. However, heating shellfish affects the sensory qualities of the product, making it less desirable for consumption as a raw shellfish. Heat treatment as a means of controlling microorganisms and bacteria in food products results in diminished taste and reduced nutritional content. Therefore, elevated temperatures are considered unsatisfactory

for processing of raw oysters where the purpose of the process is to retain the sensory qualities of oysters and sell them on a half-shell. Ionizing irradiation is relatively expensive and has not yet obtained approval by the Federal Food and Drug Administration. Other known attempts to purify raw oysters involve depuration, wherein oysters are soaked in a tank of water for days at a time in an attempt to purge and cleanse the mollusk of the bacteria. So far, there have been no reports on the success of this method for destroying bacteria in raw oysters.

Other suggested methods to destroy *Vibrio Vulnificus* involve cold, freezing, vacuum packaging, use of GRAS (diacetyl) compounds, suspension relaying into offshore water, and food condiment treatment. While some of these methods are relatively simple to implement, most of them have problems - too expensive, ineffective, time consuming, or without FDA approval.

An additional factor that should be taken into consideration when selling raw seafood are the sensory qualities of the product, its texture, taste and appearance. Among connoisseurs, it is recognized that a good raw oyster has a mild salty taste. An ideal oyster has about 12 parts per thousand of salt in the juice. However, in some cases, due to various environmental factors, oysters are not salty, which makes them less desirable from the standpoint of marketing a perfect product. High-pressure treatment is believed to provide a solution to the problem of retaining sensory qualities of seafood. The method disclosed in the application-in-suit offers a safe method of eliminating naturally-occurring pathogenic bacteria from shellfish, while retaining sensory characteristics of the shellfish such that the processed shellfish has the raw shellfish appearance, texture and taste.

The discovery by the inventor, Mr. Voisin, of a safe method of eliminating the pathogens was met with universal acclaim and widespread utilization in the seafood processing industry,

including licensing of the technology to many commercial enterprises. The Patent Office appears to be totally unimpressed by these considerations and continues to reject the claims of the application by selective text manipulation and inference, with perfect hindsight of Mr. Voisin's inventive contribution in this field. The applicant presented ample evidence that this achievement eluded persons working in the field, including university scientists and technologists. Despite the wide recognition of the invention by the seafood processing industry, the Patent Office simply manipulates selectively extracted texts, ignores the actual peer response and acclaim at the time the invention was made, and decides that this long-sought advance in food safety was inherently present in the cited reference or would have been obvious to a person of ordinary skill in the art.

Inventor Ernest A. Voisin presented evidence that he was the first to achieve success in elimination of pathogenic organisms in shellfish without affecting the sensory characteristics of raw seafood. The Patent Office alleges that this significant technological achievement is a simple routine that is obvious to an ordinary artisan or inherent in the Japanese publication. The Plaintiff points out that Mr. Voisin's invention must be viewed in the context of the knowledge at the time the invention was made, at the time when the need for a safe solution to a real public health danger was great.

## IV.    APPLICABLE LAW

This case is before the Court on the parties' cross motions for summary judgment. Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. District of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). Likewise, in ruling on cross-motions for summary judgment, the court shall grant

summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  See Rhoads v. McFerran, 517 F.2d 66, 67 (2d Cir. 1975).

The "PTO is an agency subject to the Administrative Procedure Act" ("APA"), and therefore "a reviewing court must apply the APA's court/agency review standards." Mazzari v. Rogan, 323 F.3d 1000, 1004 (Fed. Cir. 2003). Accordingly, the Court should set aside legal actions of the Board that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and set aside factual findings that are "unsupported by substantial evidence." 35 U.S.C. § 706 (2000); Mazzari, 323 F.3d at 1005; In re Gartside, 203 F.3d 1305, 1316 (Fed. Cir. 2000)

## A.    Anticipation Under 35 U.S.C. § 102

To establish that a publication anticipates a claim of an application claim under 35 U.S.C. § 102(b), the Patent Office must make a prima facie showing that  all features of the claims at issue are found in a single prior art reference. See Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical Education and Research, 304 F.3d 1221, 1227 (Fed. Cir. 2002) (stating that anticipation "requires that all of the elements and limitations of the claimed subject matter must be expressly or inherently described in a single prior art reference"). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991).

If each and every element of the claims is not expressly present in the publication, then a defendant may attempt to rely on the doctrine of inherency. However, that doctrine is quite restrictive and strictly requires that the missing descriptive material must be "necessarily

present" within the four corners of the publication. See <u>Rosco, Inc. v. Mirror Lite Co</u>., 304 F.3d 1373, 1380 (Fed. Cir. 2002) ("Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art.") (quoting <u>Trintec Indus. Inc. v. Top-U.S.A. Corp</u>., 295 F.3d 1292, 1295 (Fed. Cir. 2002)); <u>Mentor H/S, Inc</u>. <u>v. Med. Device Alliance, Inc</u>., 244 F.3d 1365, 1376 (Fed. Cir. 2001) ("The mere fact that a certain thing may result from a given set of circumstances is not sufficient.").

**B.    Inherent Anticipation**

In its recent decisions dealing with the issue of "inherent anticipation" the Federal Circuit confirmed that a single prior art reference must disclose each and every limitation of a claim in order to invalidate that claim by anticipation. <u>Perricone v. Medics Pharmaceutical Corp</u>., 432 F.3d 1368, 1375-76 (Fed. Cir. 2005); <u>PharmaStem Therapeutics, Inc. v. Viacell, Inc</u>., 491 F.3d 1342, 1359 (Fed. Cir. 2007). A reference can anticipate a claim even if it does not explicitly disclose an element if that element is inherent in the disclosure. <u>Id.</u> at 1375. However, to show inherent anticipation, any extrinsic evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference. <u>Continental Can Co. USA v.</u> <u>Monsanto Co</u>., 948 F.2d 1264, 1268 (Fed. Cir. 1991). Furthermore, the mere fact that a certain thing may result from a given set of circumstances is not sufficient for anticipation. <u>In re</u> <u>Robertson</u>, 169 F.3d 743, 745 (Fed. Cir. 1999). Exclusion of a claimed element from a prior art reference is enough to negate anticipation by that reference. <u>Rowe v. Dror</u>, 112 F.3d 473, 478 (Fed. Cir. 1997); <u>Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc</u>., 976 F.2d 1559, 1572 (Fed. Cir. 1992). The anticipating reference must enable one skilled in the art to make the anticipating subject matter. <u>Elan Pharms., Inc. v. Mayo Found</u>., 346 F.3d 1051, 1054 (Fed. Cir. 2003). In order to anticipate, the reference must place a person who has ordinary skill

in the field of the invention, in possession of the invention. See <u>Akzo N.V. v. United States Int'l</u> <u>Trade Comm'n</u>, 808 F.2d 1471, 1479 (Fed. Cir. 1986) ("anticipation requires that each and every element of the claimed invention be disclosed in a prior art reference. In addition, the prior art reference must be enabling, thus placing the allegedly disclosed matter in the possession of the public.")

## C.    Enablement

To "anticipate," the identical subject matter must not only be previously known, but the knowledge must be sufficiently enabling to place the information in the possession of the public. <u>Seymour v. Osborne</u>, 11 Wall. 516, 78 U.S. 516, 20 L.Ed. 33 (1870) [1]. The Federal Circuit applied this principle in many areas of technology. See, e.g., <u>Elan Pharmaceuticals, Inc. v. Mayo</u> <u>Foundation</u>, 346 F.3d 1051, 1054-55 (Fed. Cir. 2003) (anticipation requires enablement, whereby the reference "must teach one of ordinary skill in the art to make or carry out the claimed invention without undue experimentation"); <u>Helifix Ltd. v. Blok-Lok, Ltd.</u>, 208 F.3d 1339 (Fed. Cir. 2000) (a prior art reference that does not enable a person of ordinary skill in the art to practice the claimed invention does not anticipate the patent claims); <u>Akzo</u>, *supra* (anticipation requires that the reference publicly discloses all elements of the claimed invention and enables its practice); <u>Paperless Accounting, Inc. v. Bay Area Rapid Transit Sys</u>., 804 F.2d 659, 665 (Fed.

---

[1]  In <u>Seymour v. Osborne</u>, 11 Wall. 516, 78 U.S. 516, 20 L.Ed. 33 (1870), the Supreme Court explained:

Patented inventions cannot be superceded by the mere introduction of a [prior art reference] unless the description and drawings contain and exhibit a substantial representation of the patented improvement, in such full, clear, and exact terms as to enable any person skilled in the art of science to which it appertains, to make, construct, and practice the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent. Mere vague and general representations will not support such a defense, as the knowledge supposed to be derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and carry it into practice use. Whatever may be the particular circumstances under which the publication takes place, the account published, to be of any effect to support such a defense, must be an account of complete and operative invention capable of being put into practical operation.

Cir. 1986) (a non-enabling publication is insufficient to anticipate under § 102(b), although it may raise § 103 issues).

## D.    Obviousness Under 35 U.S.C. § 103

An obviousness rejection under 35 U.S.C. § 103 generally involves a showing that two or more prior art references, when properly combined, disclose all of the elements of the claimed invention. See Knoll Pharmaceutical Co. v. Teva Pharmaceuticals USCA, Inc., 367 F.3d 1381, 1384 (Fed. Cir. 2004); Robotic Vision Sys., Inc. v. View Eng'g., 189 F.3d 1370, 1377 (Fed. Cir. 1999) (affirming summary judgment of non-obviousness). In order for the Patent Office to establish that a claim is invalid as obvious in view of particular references, the Patent Office must address the following factual determinations: (i) the scope and content of the prior art, (ii) the differences or similarities between the prior art and the claims at issue, (iii) the level of ordinary skill in the art, and (iv) certain objective indicia of obviousness/non-obviousness, including secondary considerations. See Graham v. John Deere Co., 383 U.S. 1, 17 (1966) ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.")

The United States Supreme Court recently recognized, in KSR International Co. v. Teleflex Inc., 127 S. Ct. 1727, 1734 (2007) that almost all inventions "rely on building blocks long since uncovered" and therefore, are "combinations of what, in some sense, is already known." The Supreme Court thus concluded that a patent is not obvious simply because each of its elements was independently known in the prior art. Id. Instead, in evaluating whether the subject matter of a patent claim is obvious, courts must look at the objective reach of the claim and whether such extends to what is obvious. See Id. at 1741-42. The KSR court rejected a rigid

and formalistic application of the Federal Circuit's "teaching, suggestion, and motivation" test, pursuant to which a patent claim was obvious if there was some motivation or suggestion within the prior art, within the nature of the problem to be solved, or within the general knowledge of a person of ordinary skill in the art, to combine the prior art teachings as such were combined by the inventor." See *Id*. at 1734, 1741; see also Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1376 (Fed. Cir. 2002) (discussing the Federal Circuit's teaching, suggestion, and motivation test pre-KSR). The Supreme Court indicated in KSR that in conducting an obviousness analysis, courts must apply a common sense approach, looking at all of the circumstances, and considering any inferences or creative steps that a person of ordinary skill in the art would have employed to determine "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue."

## V.    STATEMENT OF MATERIAL FACTS

Mr. Voisin filed a patent application on July 24, 1998, entitled "A Process of Elimination of Bacteria In Shellfish, of Shucking Shellfish and An Apparatus Therefor." Some claims of the application were allowed and are now issued as patent Nos. 6,217,435 and 6,393,977. The instant appeal resulted from an adverse decision by the Board of Patent Appeals and Interferences (BPAI) of February 26, 2006 affirming examiner's rejection of Claims 6 and 27 under 35 U.S.C. § 102(b) and Claims 3, 4 and 7 under 35 U.S.C. § 103(a).

The instant invention relates to a process of treating seafood for the purpose of elimination of pathogenic naturally-occurring marine bacteria, such as, for instance, *Vibrio Vulnificus*. More specifically, the process of destroying bacteria in raw molluscan shellfish involves treatment of raw shellfish in a shell by depositing the raw shellfish into a provided pressure vessel, loading the pressure vessel with a pressure-transmitting liquid, pressurizing the

11

vessel and exposing the raw shellfish to hydrostatic pressure of between 20,000 p.s.i. and 80,000 p.s.i. for 1-15 minutes without application of heat, at ambient temperature, thereby causing elimination of naturally-occurring marine bacteria while retaining sensory characteristics of raw shellfish. The shellfish is then retained at a temperature below ambient temperature. The process continues for a time sufficient to eliminate *Vibriones* bacteria. The treated raw seafood item can be oysters in the shells. Prior to exposing the oysters to the hydrostatic pressure, the oysters can be enclosed in liquid-impermeable bags filled with pressurizable liquid so as to prevent bleeding of raw oysters during treatment.

During examination, the PTO cited JP '156 alleging that this published application anticipates Claims 6 and 27 as evidenced by a publication of Cheftel. JP '156 teaches a method of opening shells of raw shellfish by applying pressure to the shellfish of 1,000ATM to 4,000 ATM (14,223.344 p.s.i. to 56,893.376 p.s.i.) for 0.5 to 5 minutes. According to the cited reference, a raw unshucked shellfish is placed into a plastic container with seawater and, after sealing it, placed in a high-pressure machine where the pressure is applied. (Exhibit 2, Paragraphs 0006 and 0007) The shellfish is then opened by hand. The PTO admitted that the cited reference does not teach elimination of pathogenic *Vibriones*.

Cheftel was cited as allegedly making it known to the public that bacteria could be killed by high pressure. Cheftel's one-page text mentions in one line a potential (not known, as the PTO would have the court to believe) application of high pressure to a grocery list of food products, including jams, juices, meats, seafood, egg whites, milk, etc. Cheftel expressly states that the above possible uses of high pressure would have to wait until higher capacity equipment is developed, until temperature control is defined, until better sanitation is achieved, until lower cost constituents can be developed, etc. Conspicuously absent from the long list of studies that

Cheftel had reviewed is the possibility of eliminating naturally-occurring marine pathogenic bacteria, such as *Vibrio Vulnificus*.

Claims 3, 4 and 7 were finally rejected under 35 U.S.C. § 103(a) as being unpatentable over JP '156 in view of Tesvich. The PTO acknowledged that the cited references did not recite a method of eliminating bacteria and any effect upon pathogenic *Vibriones* bacteria. The PTO applied Tesvich (U.S. Pat. No. 5,773,064) to show that the use of refrigerated temperatures and the use of bands around oyster shells were known at the time the application-in-suit was filed. The PTO concluded that the method steps utilized in the Japanese reference are the same as those claimed in Claims 3, 4, and 7 and thus one of ordinary skill in the art would have expected the same results. The PTO indicated that "the claimed characteristic of eliminating pathogenic *Vibriones* bacteria is considered an inherent property and result of the referenced method, and not unique to the instant invention, absent any clear and convincing evidence or arguments to the contrary."

## VI.    ARGUMENT

For the reasons detailed below the plaintiff submits that the PTO improperly applied the law of anticipation and obviousness in concluding the claimed characteristic of the elimination of pathogenic bacteria would have been inherent in the oyster shucking method of JP '156.

### 1.    35 U.S.C. § 100(b) Provides For Issuance of Patent on a New Use of a Known Process

35 U.S.C. § 101 provides:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title [35 U.S.C. §§ 1 et seq.].

35 U.S.C. § 100(b) defines process" as follows:

> The term "process" means process, art or method, and includes a new use of a
> known process, machine, manufacture, composition of matter, or material.
> (emphasis added)

The Patent Office is required, by law, to issue patents on new uses of a known process. Even assuming, *arguendo*, that the process claims of the application-in-suit recite nothing more than a new use of the shell shucking process disclosed by JP '156, the PTO is still required to issue a patent on Claims 3, 4, 6, 7, and 27 of the application-in-suit in compliance with the provisions of 35 U.S.C. §§ 100 and 101. To rule otherwise would be to ignore the specific statute governing the U.S. patent law.

While it is true that one cannot obtain a patent for a composition when a new property of the composition is discovered, the claims at issue are not for a composition but for a newly discovered process. No cited reference teaches ALL limitations of the instant claims or discloses the process conditions, by which the Plaintiff produced bacteria elimination in shellfish without affecting sensory characteristics of the shellfish. Therefore, the BPAI's ignored the clear dictates of the law when it required that the Plaintiff produce evidence that the instant claims produce anything more than the process of pressure treatment within the claimed parameters for elimination of bacteria in shellfish.

### 2.     The Method of JP '156 Does Not Encompass the Instant Process

The BPAI erroneously suggests that the instant Claims 6 and 27 are anticipated because the cited reference allegedly encompasses the parameters recited in the claims. It is not true. A careful reading of Claim 27, for instance, reveals that the pressure parameters are between 20,000 p.s.i. and 80,000 p.s.i. JP '156 suggests pressures of between 1,000ATMs and 4,000ATMs (14,615 – 58,460 p.s.i.). A partial overlapping of pressures is not sufficient for the finding of anticipation. In <u>Atofina v. Great Lakes Chem. Corp.</u>, 78 U.S.P.Q.2d 1417 (Fed. Cir.

2006), the Federal Circuit reversed the District Court's determination that the patent claims were anticipated by a Japanese reference, which disclosed temperature range of 150°C to 350°C, while the patent claims recited the temperature range of 350°C to 450°C. The Federal Circuit determined that no reasonable fact finder could conclude that the patent was anticipated by such a disclosure. Additionally, the Federal Circuit indicated that the Japanese reference did not encompass the patent claims, where the Japanese reference disclosed oxygen-to-methylene-chloride molar ratios of 0.001 percent to 1.0 percent, while the patent claims recited 0.1 – 5.0 percent.    The Federal Circuit determined that even though there was some overlap, the overlap did not cover the entire claimed range with sufficient specificity to anticipate the claims of the patent-in-suit.

Here, even though there exists some overlap in the pressure ranges used for the treatment of shellfish, such overlap is not sufficient to render Claims 6 and 27 anticipated. No reasonable fact-finder could find anticipation un the circumstances in the instant case.

The Defendant's reliance on MEHL/Biophile Int'l Corp. v Milgraum, 192 F.3d 1362 (Fed. Cir. 1999) is misplaced.    In MEHL, at issue was a claim for a method of hair depilation, comprising the steps of aligning a laser light applicator substantially vertically over a hair follicle opening, with the applicator having an aperture of sufficient area to surround a hair follicle and overlie its papilla. One of the references, The RD-1200, did not discuss hair follicles, "let alone aligning the laser over a hair follicle opening." The RD-1200 manual taught aiming the laser at skin pigmented with tattoo ink; it was silent on the issue of hair depilation and the need for a vertical alignment. The second reference, "the Pola Article," was indeed directed to a study on the epilated backs of guinea pigs, which naturally have "hairy backs." The Pola Article disclosed a method of exposing the Q-switched ruby laser to the guinea pig skin such that "[t]he collimated

laser beam struck a circular aperture, 2.5 mm in diameter, held in contact with the skin of the animals." In MEHL, the record showed that holding the collimated laser in contact with the skin would align it perpendicular to the skin surface and therefore substantially vertically over follicle openings. As a result, the Federal Circuit found inherent anticipation by the Pola Article only and not by the RD-1200 reference.

In view of the above, Claims 6 and 27 are not anticipated by JP '156 despite the partial overlap in pressure ranges. Similarly, the Defendant erroneously affirmed the rejection of claims 3, 4, and 7 as being obvious in view of JP '156 because of this partial overlap of the pressure criteria.

### 3. Defendant's Use of the Extrinsic Reference to Assert Inherency Is Nothing More Than an Obviousness Argument in Disguise

Anticipation cannot be shown by combining more than one reference to show elements of the claimed invention. See e.g., Scripps Clinic & Research Foundation v. Genetech, Inc., 927 F.2d at 1576 (F. Cir. 1991) ("The role of extrinsic evidence is to educate the decision-maker to what the reference meant to persons of ordinary skill in the field of the invention, not to fill gaps in the reference"). If more than one reference is required to establish unpatentability of the claimed invention, anticipation under § 102 cannot be found, and patentability is determined in terms of § 103. Continental Can Company USA, 948 F.2d at 1267. The Defendant here cannot demonstrate that each limitation of Claims 6 and 27 in the application-in-suit is found in a single reference, JP '156. The PTO already admitted that JP '156 does not teach or disclose the process step of bacteria elimination. The cited reference is also silent on the temperature criteria recited in the instant Claims 6 and 27.

Erroneously, the PTO has cited Cheftel's reference as allegedly showing that elements in the claims of the application-in-suit are present in the prior art. The Cheftel reference was not

used for educating a decision-maker about the meaning of the claim terms in the JP '156 but rather to fill the gaps in the Japanese reference that is silent on the crucial step of the process – elimination of pathogenic bacteria in shellfish.

Moreover, JP '156 fails to disclose the preferred temperature, at which the seafood should or could be processed in order to prevent destruction of sensory characteristics of raw seafood. One of ordinary skill in the art would have to either guess the temperature required for the task or to perform numerous experiments to arrive at the enabled criteria.

As such, the PTO's arguments for anticipation are, in reality, one for obviousness. See Titanium Metals Corp. v. Banner, 778 F.2d 775, 780 (Fed. Cir. 1985) (citing 1 Donald S. Chisum, Chisum on Patents § 3.02) ("[A]nticipation under § 102 can be found only when the reference discloses exactly what is claimed and that where there are differences between the reference disclosure and the claim, the rejection must be based on § 103 which takes differences into account"). Since the Defendant failed to establish prima facie case of literal anticipation, Claims 6 and 27 should be allowed.

### 4.    Persons Skilled in the Art of Seafood Processing Do Not Recognize JP '156 as "Inherently, Inevitably" Leading to the Result Recited in Voisin's Claims

JP '156 discloses a process of opening a shell of raw unshucked shellfish, for example an oyster, using high-pressure processing. Claims of the application-in-suit recite a method of eliminating pathogenic organisms in raw molluscan shellfish, using pre-determined pressure, for a pre-determined period of time and at ambient temperature. JP '156 was initially cited in the International Search Report conducted by the European Patent Office in the corresponding PCT application filed by Mr. Voisin. The authorized officer of the European Patent Office, the designated International Searching Authority, classified JP '156 as a reference defining the general state of the art and not of particular relevance (category "A"). When a highly-respected

Patent Office finds the reference to be of no particular relevance to the claims at issue, it becomes a strong indication and confirmation that the cited reference cannot be recognized as defeating novelty of the claims as understood by artisans in the field of marine biology.

Additionally, of record in the instant application is a letter from Dr. Marilyn Kilgen, Head of the Department of Biological Sciences of Nicholls State University (already of record but attached herewith as Exhibit A). Dr. Kilgen addresses in detail the issue of elimination of pathogenic bacteria, such as *Vibrio Vulnificus*, in raw seafood products. She also discusses how various techniques for elimination of bacteria were not successful, as being too costly, too time-consuming, without   FDA approval or simply too inconvenient. At the request of Mr. Voisin, Nicholls State University, specifically Dr. Kilgen, performed numerous experiments to test the efficacy of the method claimed in the present application. The results proved positive. Dr. Kilgen can be referred to as a person having more than ordinary skill in the art; she specifically characterized Mr. Voisin's method as being "novel."

Of record in the instant case is additional evidence, testimony of people having "more than average" skill in the relevant art of marine biology. One of such artisans is Robert L. Collette, Vice-President of Science and Technology of the National Fisheries Institute. In his letter (Exhibit B), Mr. Collette characterizes Mr. Voisin's invention as a "breakthrough needed to correct the problem" [of reducing *Vibrio Vulnificus* bacteria]. According to Mr. Collette, the new process "is truly impressive when considering the amount of time and money spent by universities and scientists worldwide to solve this concern."

Another specialist is Michael W. Moody, Ph. D., Seafood Technologist of the Louisiana State University Agricultural Center (his statement is attached as Exhibit C). After introducing his impressive credentials, Dr. Moody describes in his letter the problem of raw molluscan

shellfish contamination by *Vibrio Vulnificus*. Dr. Moody states that "prior to Mr. Ernest Voisin contacting [him] about the possibility of using high pressure treatment for the elimination of *Vibrio Vulnificus* in raw molluscan shellfish, [he] was not aware of the process being used anywhere or by anyone for that purpose." Dr. Moody continues to state that he "was not aware of anyone suggesting that the process be used for that purpose." This is additional evidence that a "person of ordinary skill in the art" considers the instant invention novel and nonobvious.

Also of record in this case are declarations of Messrs. Chauvin, Michael Voisin, Nelson and Sunseri,[2] who had reviewed the cited references of JP '156 and Cheftel and who declared that in their learned opinion, the method steps disclosed in the Japanese publication did not teach or "enable" them, as persons of ordinary skill in the art, how to use the described method for bacteria elimination. When the reference does not enable persons of ordinary skill in the art  to practice the invention the reference cannot be characterized as anticipatory. Elan Pharmaceuticals, Inc. v. Mayo Foundation, 346 F.3d 1051, 1054-55 (Fed. Cir. 2003).

Having considered the letters from these experts and artisans in the field, the BPAI cavalierly responded that the experts failed to present any evidence to support their conclusions. Dr. Kilgen's six-page letter is more detailed than anything the PTO managed to produce after almost eight years of examination of this application. The PTO produced no affidavit from a person skilled in the art, no expert testimony whatsoever to counter the powerful evidence plaintiff had proffered. The BPAI's argument must fail.

Additionally, the BPAI failed to cite any case law that would have required persons of ordinary skill in the art to offer "**material evidence**" as to their recognition of the cited reference as failing to "inherently anticipate." In fact, such requirement would be contrary to the very

---

[2] These declarations are attached hereto as Exhibits D, E, F, G, respectively.

concept of recognition by persons of ordinary skill that the claimed subject matter is necessarily present in the cited reference. No "evidence" of such recognition is required. The alleged recognition is either present or absent. All witnesses testified that they did not recognize the cited reference as inherently anticipating or making inherently obvious the claims of the instant application. As the established law states, "In order to anticipate, the reference must place a person who has ordinary skill in the field of the invention, in possession of the invention." Akzo N.V. v. United States Int'l Trade Comm'n, 808 F.2d at 1479. If both the experts, such as the University research professor who had spent years trying to solve the very problem that Mr. Voisin solved, and persons of ordinary skill affirmatively state that in their opinion Mr. Voisin's invention is a breakthrough and that a thorough review of JP '156 and Cheftel did not enlighten them on how to process shellfish and thereby eliminate bacteria, the Plaintiff has fully met its burden of presenting sufficient and credible evidence to traverse the PTO's claim rejection based on anticipation and obviousness. The BPAI acted arbitrary and capriciously, and contrary to substantial evidence preferred by the Plaintiff when it affirmed the examiner's rejection of the claims.

It is well established that the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the elements of the claimed invention. In re Baxter Travenol Labs., 952 F.2d 388, 390 (Fed. Cir. 1991); Continental Can Co. v. Monsanto Co., 948 F.2d at 1268-69 (to anticipate, every element of the claims must appear in a single prior art reference, or if not expressly shown, then demonstrated to be known to persons experienced in the field of technology); In re Samour, 571 F.2d 559, 562 (CCPA 1978) (the key question is whether a single prior art reference "publicly discloses every material element of the claimed subject matter"). Since JP '156 does not teach all of the elements of the

claimed invention to persons skilled in the art and is not recognized as providing a roadmap to the solution of the long-standing problem, the PTO has not met its burden of establishing prima facie anticipation, or alternatively, if the PTO is found to have established prima facie anticipation, the Plaintiff adequately rebutted it with showing of uncontroverted facts supporting the opposite conclusion by letters and declarations submitted by the Plaintiff.

As stated above, the principle of "inherency" requires that any information missing from the reference would nonetheless be known to be present in the subject matter of the reference, when viewed by artisans in the relevant field. As the Federal Circuit emphasized, "anticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation, [or the reference] cannot inherently anticipate the claims." Transclean Corp. v. Bridgewood Servs., Inc., 290 F.3d 1364, 1373 (Fed. Cir. 2002); Hitzeman v. Rutter, 243 F.3d 1345, 1355 (Fed. Cir. 2001) ("consistent with the law of anticipation, an inherent property must necessarily be present in the invention described by the count, and it must be so recognized by persons of ordinary skill in the art"); In re Robertson, 169 F.3d 743, 745 (Fed. Cir. 1999) (that a feature in the prior art reference "could" operate as claimed does not establish inherency).

The PTO engaged in hindsight reconstruction of the Japanese reference and failed to recognize that it does not provide the necessary guidance on the important criteria of temperature or bacteria elimination in shellfish. Hindsight is not an available analytical mechanism to reject the claims. Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1138 (Fed. Cir. 1985) ("The invention must be viewed not with the blueprint drawn by the inventor, but in the state of the art that existed at the time.") After reading the cited reference, a person of ordinary skill in the art is no closer to the solution of bacterial contamination because the persons skilled in the art did not

recognize the steps of JP '156 as teaching them how to solve their problem. Therefore, it was an error for the PTO to reject Claims 6 and 27 as being inherently anticipated by the Japanese reference. Since the requirements of inherent anticipation were not met, the PTO's rejection of Claims 6 and 27 should be reversed as being arbitrary, capricious, an abuse of discretion and not supported by substantial evidence.

### 5.    Defendant Cannot Prove That Missing Elements Are Inherent in the Disclosures of the JP '156 Application and Cheftel's Paragraph Headings

In order to prove inherent anticipation, the extrinsic evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference. Continental Can Company USA, 948 F.2d at 1268.  Although an accidental achievement of a product or process does not constitute an anticipation, a necessary consequence of what was intended can constitute inherent anticipation. Such inevitable though unappreciated anticipation is found where the prior art reference necessarily functions in accordance with, or includes, the claimed limitations. Atlas Powder Co. v. Ireco Inc., 190 F.3d 1342, 1347 (Fed. Cir. 1999).

Here, because it is beyond dispute that the prior art patents do not necessarily function in accordance with the claimed limitations, the Defendant's inherency arguments fail as a matter of law. The fact that the application-in-suit and the JP '156 provide for the pressure treatment of molluscan shellfish, does not, in itself, support a finding of inherency. For example, in Perricone, the patentee's claims disclosed the treatment of skin sunburn using a composition lotion, whereas the prior reference disclosed that composition for topical application to obtain general skin benefits. The patentee argued that since the prior art reference did not disclose any benefit directed to skin sunburn, or any other specific skin disorder, as claimed in his patent, the Court should reverse the District Court's finding of inherent anticipation. The Federal Circuit agreed

and rejected the District Court's finding of inherent anticipation by the prior art reference. Perricone, 432 F.3d at 1378-80.

The Federal Circuit Court explained that because the patent at issue disclosed "a method for treating sunburn," it was not anticipated by the prior art patent. Specifically, the Court stated: "The issue is not . . . whether [the prior art patent] if applied to skin burn would inherently treat that damage, but whether [the prior art] discloses the application of its composition to skin sunburn. It does not." Id. at 1378.

In this case, the Defendant argues that because the JP '156 discloses oyster shucking using high pressure processing, all benefits which may flow from that application are anticipated by this reference. This blanket view of anticipation is erroneous as a matter of law. See id. ("New uses of old products or processes are indeed patentable subject matter.") (citing 35 U.S.C. § 101 (2000)); In re King, 801 F.2d 1324, 1326 (Fed. Cir. 1986) (the principles of inherency do not prohibit a process patent for a new use of an old structure). Cheftel's one-page text with two paragraph headings is similarly irrelevant. The Defendant's argument fails as a matter of law.

Therefore, the BPAI acted arbitrary and capriciously when it affirmed the rejection of the claims. Examiner failed to make prima facie case of anticipation or obviousness. Even if the Court finds that such the PTO sustained its initial burden of proof, the Plaintiff successfully traversed the rejection and shifted the burden back to the Patent Office of coming with additional proof or evidence of the prior art teachings. The actions of the BPAI in not recognizing this fact were an abuse of discretion and/or unsupported by substantial evidence.

### 6. The Cited Reference Does Not Provide an Enabling Disclosure

No cited reference describes the conditions by which Mr. Voisin produced elimination of bacteria in raw molluscan shellfish without affecting its sensory characteristics. No reference

23

suggests conducting the process at ambient temperature, at high pressure for a time sufficient to eliminate *Vibrio Vulnificus*. The tests conducted by Mr. Voisin evidence that not all pressures listed in the JP '156 would necessarily result in bacteria elimination, with sensory characteristics being unaffected. The Plaintiff attaches, as Exhibit 3, a Declaration of the inventor, Mr. Ernest Voisin, who conducted several experiments to test workability of the JP '156. The tests clearly demonstrated that without addition of the temperature factor, JP '156 worked only some of the time. These tests confirmed that the temperature factor is important for the process of oyster shucking. The inventor also discovered that the temperature factor is important when processing raw seafood and striving to retain its sensory characteristics.

Since JP '156 does not recognize the temperature criteria as being important, and since the method as described by JP '156 cannot lead a person of ordinary skill to success without undue experimentation, as required by the enablement requirement, the PTO's argument must fail. A non-enabling reference cannot serve as a basis of inherent anticipation, either expressly or inherently. Therefore, the BPAI acted arbitrary and capriciously when it affirmed the rejection of the claims. Examiner failed to make prima facie case of anticipation or obviousness. Even if the Court finds that such the PTO sustained its initial burden of proof, the Plaintiff successfully traversed the rejection and shifted the burden back to the Patent Office of coming with additional proof or evidence of the prior art teachings. The actions of the BPAI in not recognizing this fact were an abuse of discretion and/or unsupported by substantial evidence.

### 7.    The PTO's Obviousness Rejection Ignores the Evidence of Record and Constitutes an Abuse of Discretion

As confirmed by the Supreme Court decision in <u>KSR,</u> the Patent Office must address the following factual determinations: (i) the scope and content of the prior art, (ii) the differences or similarities between the prior art and the claims at issue, (iii) the level of ordinary skill in the art,

and (iv) certain objective indicia of obviousness/non-obviousness, including secondary considerations.

First, the PTO must determine who is a person of ordinary skill in the art. Plaintiff submits that a person of ordinary skill in the art is a marine biologist or a seafood processor intimately familiar with the issues involved in bacteria contamination. The inventor presented credible and extensive evidence that the persons skilled in the art did not find the claims of his application as being made obvious by the cited references. The PTO's Examiner, by his own admission made during an office conference, is not a marine biologist and had never seen a raw oyster.

Second, the PTO must determine the scope and content of the prior art at issue, namely, the JP '156 and Cheftel and whether such, as the Defendant suggests, would make it apparent to persons skilled in the art that pressure-treatment of molluscan shellfish at 1,000 ATMs to 4,000 ATMs for 0.5-10 minutes achieves bacteria elimination. Cheftel presents a grocery list of items, which in his purely theoretical observation would benefit from high-pressure processing when elimination of pathogens is required. To infer from Cheftel that JP' 156 could be modified to eliminate bacteria in shellfish and that such modification would be obvious is like arguing that Leonardo De Vinci's flying machine made obvious the airplane invented by the Wright brothers.

Third, the PTO must examine the differences between the claims and the cited prior art. Claims 3, 4 and 7 of the application-in-suit relate to a process of destroying bacteria in raw molluscan shellfish. Claim 3 recites the steps of depositing raw molluscan shellfish in a pressure vessel, then loading a pressure transmitting liquid into the pressure vessel, then pressurizing the vessel to between 20,000 p.s.i. and 80,000 p.s.i. for 1-15 minutes, thereby causing elimination of naturally-occurring marine bacteria, while retaining sensory characteristics of the shellfish. The

processed shellfish is then retained at a temperature below ambient temperature (last step in Claim 3). As recited in Claim 4, the process of the application-in-suit is conducted until *Vibriones* bacteria is eliminated. Claim 7, which depends on Claim 6, introduces another feature – oysters can be enclosed in liquid-impermeable bags filled with pressurizable liquid prior to exposing them to high hydrostatic pressure.

The Defendant acknowledged that JP '156 is silent on the possible use of certain pressures and time criteria when desiring elimination of pathogenic bacteria in shellfish. Additionally, JP '156 does not teach that a pressure-transmitting liquid should be loaded into the vessel prior to depositing the plastic bags with oysters into the vessel. Instead, JP '156 requires that oysters and seawater be sealed in plastic containers, which are then deposited into a pressure vessel. JP '156 does not teach that processing should or could be conducted at ambient temperature. Cheftel provides virtually no guidance as to the pressures, times or temperatures necessary to achieve elimination of bacteria in raw molluscan shellfish. The Cheftel reference is nothing more than a "building block" that the Supreme Court referred to in KSR; it cannot render claims obvious simply because it mentions a possible application of hydrostatic pressure for bacteria elimination.

Therefore, the prior art not only fails to teach shellfish pressurization between 20,000 p.s.i. and 80,000 p.s.i. at ambient temperature for 1-15 minutes or until bacteria is eliminated, it also fails to teach several other steps in the process recited in the instant claims.

Fourth, the PTO must make a preliminary finding as to whether one of ordinary skill in the art would have recognized, from the disclosure of JP '156 that the pressure and time criteria disclosed therein, could or should be used for processing of shellfish to eliminate naturally-occurring pathogenic marine bacteria and that such processing would result in the retention of

sensory characteristics of raw shellfish. According to the PTO reasoning, a person of ordinary skill in the art should have chosen JP '156 as the most promising method of eliminating bacteria in shellfish out of a multitude of suggestions made by scientists through the years, including heat, irradiation, pasteurization, etc. The PTO did not and could not provide any evidence of such recognition in the relevant field. The Plaintiff, on the other hand provided ample evidence that Mr. Voisin's invention stands out as a breakthrough in the field littered with failed attempts.

Finally, the PTO must consider whether any secondary considerations, or objective indicia of non-obviousness, such as the failure of others, a long-felt and unresolved need for the safe method, commercial success, unexpected results, and commercial acquiescence, are sufficient to rebut a prima facie showing of obviousness. See, e.g., Eli Lilly & Co. v. Zenith Goldline Pharm., Inc., 471 F.3d 1369, 1380 (Fed. Cir. 2006) .

Plaintiff presented uncontroverted evidence that the solution to the problem of seafood contamination has plagued the industry for many years; that numerous attempts have been made by scientists and technologists – all discarded as unreliable, not commercially feasible or simply impractical. The evidence of industry recognition speaks for itself. The numerous licenses granted to other seafood processors – all attest to the commercial success of the invention. When this evidence is properly analyzed it will lead to an inescapable conclusion that Claims 3, 4, and 7 are nonobvious in view of the cited prior art.

The PTO and BPAI failed to make prima facie case of obviousness as required by Graham v. John Deere and KSR, Even if the Court finds that the PTO met its burden and established prima facie case of obviousness, the Plaintiff submits that it met its burden of proof by presenting substantial and uncontroverted evidence of nonobviousness of Claims 3, 4, and 7 within the holdings of Graham v John Deere and KSR. The BPAI's actions/findings in affirming,

or rather rubber-stamping, the examiner's conclusory, self-serving statements were therefore arbitrary and capricious, an abuse of discretion and not supported by substantial evidence presented by the Plaintiff.

## VII. CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, plaintiff submits that it is entitled to judgment as a matter of law on the separate issues of anticipation and obviousness.

Respectfully submitted,


/s/Thomas S. Keaty
Thomas S. Keaty, *pro hac vice*
Attorney for Plaintiff
Keaty Professional Law Corporation
2140 World Trade Center
No. 2 Canal Street
New Orleans, LA 70130
(504) 524-2100
(504) 524-2105 (fax)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

INNOVATIT SEAFOOD SYSTEMS, LLC,    )
    )
       Plaintiff,    )
    )
    v.    )    Civil Action No. 06-0822(JR)
    )
COMMISSIONER FOR PATENTS,    )
    )
       Defendant.    )

**STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF INNOVATIT SEAFOOD
SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL
RULE LCvR 7(h)**

Pursuant to Local Rule LCvR 7(h), Plaintiff, Innovatit Seafood Systems, Inc. ("Innovatit"
or "Plaintiff") hereby submits the following statement of uncontested facts in support of its
motion for summary judgment that: (1) Claims 6 and 27 of its application Serial No. 09/121,725
("application-in-suit) are not anticipated by Japanese application No. JP 4356156A ("JP '156");
(2) Claims 3, 4, and 7 of the application-in-suit are non-obvious in view of JP '156 taken alone
or in combination with any other reference.

1.      Innovatit Seafood Systems, Inc. is the plaintiff in this lawsuit. The real party in
interest is the current assignee of the application-in-suit, Avure Technologies, Inc. of
Kent, Washington. (Exhibit 4, Assignment)

2.      Application-in-suit is application Serial No. 09/121,725 filed on July 24, 1998 by
Ernest A. Voisin. (Exhibit 1)

3.      Avure Technologies, Inc. ("Avure") is the owner of all right, title and interest in
and to the application-in-suit. (Exhibit 4)

1

4.      On February 26, 2006, the Board of Patent Appeals and Interferences (BPAI) of the U.S. Patent Office ("PTO") affirmed rejection of Claims 3, 4, 6, 7 and 27 of the application-in-suit. (Exhibit 5)

5.      In its decision, BPAI stated that Claims 6 and 27 are anticipated by JP '156 and Claims 3, 4, and 7 are obvious in view of JP '156. (Exhibit 5)

6.      Claim 3, an independent claim, is directed to a process for destroying bacteria in raw molluscan shellfish, while the shellfish is in the shell, which comprises the steps of providing a pressure vessel, depositing said shellfish into said pressure vessel; loading a pressure-transmitting fluid into said pressure vessel; pressurizing the pressure vessel to high pressure of between 20,000 p.s.i. and 80,000 p.s.i., without application of heat, for a period of time between 1 and 15 minutes, thereby causing elimination of naturally-occurring pathogenic marine bacteria, while retaining sensory characteristics of the shellfish, and then retaining the shellfish at a temperature below ambient temperature. (Exhibit 1, p. 19)

7.      Claim 4, which depends on Claim 3, recites exposing the raw shellfish to isostatic pressure for a time period sufficient to eliminate pathogenic *Vibriones* bacteria.  (Exhibit 1, p. 19)

8.      Claim 6, an independent claim, recites a process of treating raw oysters in a shell, which comprises the steps of exposing raw oysters to hydrostatic pressure of between 20,000 p.s.i. and 80,000 p.s.i. for 1 – 15 minutes at ambient temperature, without causing thermal and mechanical damage to the raw oysters, thereby eliminating pathogenic *Vibriones* bacteria in the raw oysters, preventing deterioration of said raw oysters, while retaining sensory characteristics of the raw oysters. (Exhibit 1, p. 19)

2

9.      Claim 7, which depends on Claim 6, recites that the oysters are banded and enclosed in liquid-impermeable bags filled with pressurizable liquid prior to exposing the oysters to hydrostatic pressure so as to prevent bleeding of raw oysters during treatment. (Exhibit 1 p. 19)

10.     Claim 27, an independent claim, recites a process of treating raw molluscan shellfish, comprising the steps of depositing the raw molluscan shellfish into a pressure vessel and pressurizing the  pressure vessel to between 20,000 p.s.i. and 80,000 p.s.i. for 1-15 minutes without application of heat at ambient temperature, without causing thermal and mechanical damage to the raw molluscan shellfish, while eliminating pathogenic naturally-occurring marine bacteria in the raw molluscan shellfish, and while retaining sensory characteristics of said raw molluscan shellfish.   (Exhibit 1, pp. 19-20)

11.     JP '156 teaches a method of opening shells of raw shellfish by applying pressure to the shellfish of 1,000ATM to 4,000 ATM (14,223.344 p.s.i. to 56,893.376 p.s.i.) for 0.5 to 5 minutes. According to the cited reference, the raw unshucked shellfish is placed into a plastic container with seawater and, after sealing it, placed in a high-pressure machine where the pressure is applied. The shellfish is then opened by hand. (Exhibit 2, paragraphs 0006-0007)

12.     JP '156 does not teach treatment of raw molluscan shellfish at ambient temperature.

13.     JP '156 does not teach processing of shellfish at pressure of between 20,000 p.s.i. and 80,000 p.s.i. for 1-15 minutes.

14.     JP '156 does not teach loading pressurizable liquid into the pressure container.

15.    The PTO cited publication of Cheftel, "Effects of high hydrostatic pressure on food constituents: an overview," High Pressure and Biotechnology, Colloque INSERM/John Libbey Eurotext Ltd., 1992, vol. 224, p. 204, heading 1.2, in combination with JP '156 to assert anticipation of Claim 6 and 27 and obviousness of claims 3, 4, and 7. (Exhibit 6, Examiner's Answer)

16.    Cheftel does not teach a process of elimination of bacteria in shellfish comprising the steps of pressuring raw shellfish to between 20,000 p.s.i. and 80,000 p.s.i. at ambient temperature for 1-15 minutes.

17.    Cheftel does not teach any process of processing shellfish to eliminate naturally-occurring pathogenic bacteria.

18.    Dr. Kilgen (Exhibit A) stated that the applicant's invention is a "novel" method of eliminating vibrio contamination of shellfish.

19.    Mr. Collette, in his letter (Exhibit B), referred to Mr. Voisin's invention as a "breakthrough needed to correct the problem" [of reducing *Vibrio Vulnificus* bacteria].

20.    Dr. Moody's letter (Exhibit C) states that "prior to Mr. Ernest Voisin contacting [him] about the possibility of using high pressure treatment for the elimination of *Vibrio Vulnificus* in raw molluscan shellfish, [he] was not aware of the process being used anywhere or by anyone for that purpose."

21.    Messrs. Chauvin, Michael Voisin, Nelson and Sunseri,[3] who had reviewed the cited references of JP '156 and Cheftel and who declared that in their learned opinion, the method steps disclosed in the Japanese publication did not teach or "enable" them,

---

[3] These declarations are attached to Memorandum of Points and Authorities as Exhibits D, E, F, G, respectively.

persons of ordinary skill in the art, of how to use the described method for bacteria elimination.

22.     The PTO did not produce any affidavit from a person skilled in the art regarding inherent anticipation or obviousness.

Respectfully submitted,

/s/Thomas S. Keaty
Thomas S. Keaty, *pro hac vice*
Attorney for Plaintiff
Keaty Professional Law Corporation
2140 World Trade Center
No. 2 Canal Street
New Orleans, LA 70130
(504) 524-2100
(504) 524-2105 (fax)

1